# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5240-16T5

IN THE MATTER OF THE CIVIL
COMMITMENT OF A.Y.,
SVP-545-09.

_____

Submitted January 15, 2019 – Decided February 13, 2019

Before Judges Geiger and Firko.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket No. SVP-545-09.

Joseph E. Krakora, Public Defender, attorney for appellant A.Y. (Susan Remis Silver, Assistant Deputy Public Defender, of counsel and on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent State of New Jersey (Melissa H. Raksa, Assistant Attorney General, of counsel; Victoria R. Ply, Deputy Attorney General, on the brief).

PER CURIAM

Appellant A.Y. appeals from a Law Division judgment involuntarily civilly committing him to the Special Treatment Unit (STU) as a sexually violent predator pursuant to the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-

27.24 to -27.38. After reviewing the record in light of the contentions advanced on appeal, we affirm.

An involuntary civil commitment can follow service of a sentence, or other criminal disposition, when the offender "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." N.J.S.A. 30:4-27.26; see also N.J.S.A. 30:4-27.25. To civilly commit an individual as a sexually violent predator, the State must establish three elements by clear and convincing evidence:

> (1) that the individual has been convicted of a sexually violent offense, [N.J.S.A. 30:4-27.26]; (2) that he suffers from a mental abnormality or personality disorder, ibid.; and (3) that as a result of his psychiatric abnormality or disorder, "it is highly likely that the individual will not control his or her sexually violent behavior and will reoffend," In re Commitment of W.Z., 173 N.J. 109, 130 (2002). Although the first two elements derive directly from the statute, to comport with substantive due process concerns, [the] Court interpreted the third statutory element as requiring the State to show that a person is "highly likely," not just "likely," to sexually reoffend. Ibid.
>
> [In re Civil Commitment of R.F., 217 N.J. 152, 173 (2014).]

In order to be considered a sexually violent predator, an individual must have committed a sexually violent offense. N.J.S.A. 30:4-27.26. Sexual assault

2

is considered a sexually violent offense. Ibid. With this legal framework in mind, we will now consider the facts that led to A.Y.'s commitment under the SVPA.

We derive the facts from the trial record. A.Y. is now thirty-nine years old. In February 2006, he pleaded guilty to second-degree sexual assault, N.J.S.A. 2C:14-2(c). His conviction was predicated on the following facts. On April 11, 2005, A.Y. went to the house of his former girlfriend, N.B., who was home with her two-year-old son. A.Y. wanted to stay the night and said he would leave at 5:00 a.m. the next morning. N.B. allowed him to stay, and he slept on the couch. When the alarm went off the next morning, N.B. told A.Y. it was time to leave. A.Y. began touching her, ordered her to remove her clothes, and refused to allow her to leave the apartment. A.Y. demanded she hug and kiss him and became violent when she resisted, stating he intended to make her suffer the way she made him suffer.

When N.B. picked up her son, A.Y. told her to put him down and threatened to break the child's neck if she did not do so. A.Y. forced N.B.'s legs open and performed oral sex on her. He then forced N.B. to perform fellatio on him, threatening to harm her if she refused and to break her neck if she bit him. He then vaginally and anally penetrated her despite her complaints of pain and

demanded she suck the fecal matter off his penis. While her son cried in another room, A.Y. anally penetrated N.B. a second time. A.Y. then told N.B. to stand at the foot of her son's bed and vaginally penetrated her from behind. A.Y. told her he was going to do this to her for the next forty-eight hours and that he would hurt her son if she left or answered the door. When A.Y. left to buy cigarettes, N.B. ran upstairs to a friend's apartment and called the police.

Prior to sentencing, A.Y. underwent a psychological evaluation at the Adult Diagnostic Treatment Center in Avenel to determine his eligibility for sentencing under the purview of the New Jersey Sex Offender Act, N.J.S.A. 2C:47-1 to -10. In her report, psychologist Donna LoBiondo, Ph.D., stated A.Y.'s responses to the sexuality questionnaire included: "Something I enjoy about being a male is . . . my dominance over God's creation" and, "[t]he hard thing about being a male is . . . the ultimate responsibility of being the dominant member."

Dr. LoBiondo described A.Y.'s demeanor as "arrogant and detached." He reported being diagnosed with Bipolar Disorder with posttraumatic stress and depression. A.Y. admitted he could be overly aggressive when upset, and that there is "no limit" to his aggression when properly provoked. He stated, "really

4

most women are prostitutes." A.Y. denied sexually assaulting N.B., claiming he "didn't do anything" and that the sex "was consensual."

Dr. LoBiondo opined A.Y.'s "[o]verall clinical impression is of a psychopathic and sadistic individual who engages in aggression for his own gratification as well as the humiliation of those he perceives as vulnerable." Despite these findings, she concluded there was "insufficient evidence that [A.Y.'s] criminal behavior qualifies as repetitive and compulsive under the statute. It is more likely that antisocial, sadistic and narcissistic motivations drove his criminal sexual behavior." He was found not eligible for sentencing under the purview of the Sex Offender Act.

A.Y. was sentenced to a five-year prison term, subject to an eighty-five-percent period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, community supervision for life, N.J.S.A. 2C:43-6.4, and the requirements imposed by Megan's Law, N.J.S.A. 2C:7-1 to -23.

On October 15, 2006, while being detained on the sexual assault charge, A.Y. forcibly sodomized a fellow inmate, penetrating him repeatedly. He pleaded guilty to an accusation of third-degree criminal restraint in circumstances exposing the victim to risk of serious bodily injury, N.J.S.A. 2C:13-2(a), and was sentenced to a concurrent three-year prison term.

A.Y. did not file a direct appeal from either conviction or sentence. His subsequent petition for post-conviction relief (PCR) from the sexual assault conviction was denied. In an unpublished opinion, we affirmed the denial of PCR.

In 2009, a psychological evaluation and risk assessment of A.Y. was performed by Alicia Caputo, Ph.D., a psychologist. Her report states A.Y. reported beginning counseling at age four or five after witnessing the murder of his brother. He was prescribed medication at age eight for hyperactivity and because he "started exhibiting signs of violence toward other kids." A.Y. was in and out of psychiatric treatment as a teenager and was prescribed Paxil, Risperdal, and other medications but refused to take them.

Prior to his convictions in New Jersey, A.Y. was convicted of arson, cruelty to animals, theft by unlawful taking, and simple assault in Georgia. As to the arson and cruelty to animals convictions, A.Y. reported to Dr. Caputo that he had moved in with his girlfriend and invested much time and money into the relationship, including buying all their furniture. The relationship deteriorated and during a physical altercation he had "probably choked her." His girlfriend called the police and he was removed from the residence. A.Y. came up with the idea to go over to her residence "and burn it all up" because she had all the

A-5240-16T5

furniture and would not give it back. He set his girlfriend's residence on fire while she was not home. Her dog and cat perished in the fire.

A.Y. was treated for Posttraumatic Stress Disorder (PTSD) and Bipolar Disorder and was prescribed Geodon, Vistaril, and Zoloft while serving a prison term in Georgia from 2001 to 2004. While in prison he cut his wrist several times, stating he was depressed but denied true suicidal intent.

Upon his release from prison, A.Y. returned to New Jersey and briefly participated in outpatient treatment and was prescribed Paxil and Risperdal until his sexual assault arrest. While incarcerated in jail, A.Y. participated in mental health treatment and was prescribed Benadryl, Depakote, and Risperdal but stopped taking these medications in May 2006.

A.Y. entered the State prison system in April 2007. After reporting symptoms including sleep disturbance, anxiety, depression, irritability, and mood swings, he was prescribed Depakote, Risperdal, and Vistaril but was noted as being erratically compliant with medication. At one point he verbalized suicidal ideation. In April 2009, he returned to outpatient treatment, and was diagnosed with Mood Disorder Not Otherwise Specified (NOS) and Personality Disorder NOS. He was prescribed Benadryl, Depakote, and Zoloft.

A-5240-16T5

Dr. Caputo's report states A.Y.'s "presentation throughout his incarceration has been described as angry, antisocial, and sarcastic." He repeatedly disclosed thoughts of violence, stabbing people, or otherwise assaulting them if his demands were not met. "He also described a constant state of underlying anger and a view that relationships with people were 'only to get what I want from them.'" During her interview of A.Y., he described the criminal restraint offense, admitting he anally penetrated his cell mate with a broomstick because his cell mate was a child molester. When asked about the appropriateness of his behavior, he responded, "[t]hat's what he should get." This version conflicts with A.Y.'s contention that he engaged in consensual sex with his cell mate.

Dr. Caputo noted A.Y. underwent a parole evaluation by David Gomberg, Ph.D., in January 2009, which included the use of the Static-99[1] and MnSOST-R[2] actuarial instruments to assess his future sex offender risk. Dr. Gomberg's

_____

[1] "The Static-99 is an actuarial test used to estimate the probability of sexually violent recidivism in adult males previously convicted of sexually violent offenses." R.F., 217 N.J. at 164 n.9 (citing Andrew Harris et al., Static-99 Coding Rules Revised-2003 5 (2003)).

[2] "The Minnesota Sex Offender Screening Tool-Revised (MnSOST-R) is another actuarially derived and rigorously validated risk assessment instrument developed to aid clinicians and criminal justice officials in assessing risk for

A-5240-16T5

scoring of the MnSOST-R and Static-99 placed A.Y. in the high risk category on both instruments. Dr. Gomberg recommended A.Y. be referred for civil commitment as a sexually violent predator.

Dr. Caputo also administered the MnSOST-R and Static-99 actuarial instruments. She scored A.Y. a +10 on the MnSOST-R, placing him in the high risk category for sexual reoffending, and a 5 on the Static-99, placing him in the moderate-high risk category for sexual reoffending.

Dr. Caputo concluded both of A.Y.'s offenses "involved significant elements of violence." His sexual assault of N.B. "involved elements of sadism and humiliation," as well as using threats of violence against her two-year-old son. "More generally, [A.Y.] exhibited a significant tendency to denigrate and objectify women." With regard to his criminal restraint conviction, A.Y. "exhibited no remorse and framed his sexual assault of the victim as 'just desserts' for the victim's alleged pedophilia." Dr. Caputo stated A.Y. "exhibited no empathy for either of his sexual victims." She found A.Y. appropriate for referral for SVPA commitment upon his release from prison.

---

future sexual dangerousness in convicted sex offenders." In re J.P., 339 N.J. Super. 443, 451 (App. Div. 2001).

Dr. Caputo concluded A.Y. "has exhibited a significant penchant for violence" and "[h]is violent tendencies are the results of significant antisocial traits." She opined "[a]lthough it is highly likely that [A.Y.] will engage in violent behavior in the future, this increased risk is not considered a function of psychopathology outside the realm of severe antisocial characterological disorder."

In October 2009, the State filed a petition seeking A.Y.'s involuntary commitment under the SVPA. The clinical certificates of psychiatrists Marina Moshkovich, M.D., and Anasya Salem, M.D., identifying A.Y. as a sexually violent predator, were submitted in support of the application. A.Y. was examined by Dr. Moshkovich on October 26, 2009, and by Dr. Salem the next day. Both of their clinical certificates stated A.Y. scored a 9 on the Static-99R and a 12 on the MnSOST-R risk assessment instruments, placing him at high risk for sexual reoffending. They each diagnosed A.Y. as suffering from Polysubstance Dependence in remission due to controlled environment, Mood Disorder NOS, and Antisocial Personality Disorder (ASPD), and opined A.Y. "suffers from a mental abnormality or personality disorder that makes him likely to engage in acts of sexual violence if not confined in a secure facility for

control, care, and treatment."  A.Y. was temporarily committed to the STU pending an initial hearing.

For several years, A.Y. waived his initial commitment hearing while he unsuccessfully pursued PCR in State court, and a writ of habeas corpus in federal court.  A.Y. engaged in treatment at the STU during his temporary commitment but spent much of that period in the Modified Activities Program (MAP) [3] due to violating institutional rules.

The hearing on the State's petition was held on June 21, 2017.  The State presented the testimony of Dean M. De Crisce, M.D., an expert psychiatrist, and Laura Carmignani, Ph.D., an expert psychologist.  Appellant presented the testimony of Barry Zakireh, Ph.D., an expert psychologist.  A.Y. elected not to testify.

Dr. De Crisce performed a forensic psychiatric evaluation and issued a report in 2017.  As part of the evaluation, Dr. De Crisce utilized the Static-99R and Stable 2007 actuarial instruments.  A.Y. scored a 9 on the Static-99R, placing him at a "well above average" risk to sexually recidivate.  He scored

---

[3]  The MAP, "a component of the clinical treatment program at the STU that focuses on stabilizing disruptive or dangerous behaviors," is a behavior-related treatment modality.  M.X.L. v. N.J. Dep't of Human Servs./N.J. Dep't of Corr., 379 N.J. Super. 37, 45 (App. Div. 2005).

A.Y. at 17 on the Stable 2007, "placing him within a group of individuals with similar dynamic factors that require a high level of dynamic supervision needs." Dr. De Crisce noted A.Y. scored a 28 on the PCL-R in 2009, "which approximates the threshold of psychopathy." He also noted A.Y. "incurred a number of institutional infractions, had not participated in programming, [and] voiced multiple violent thoughts and denigrating thoughts about women." He further noted A.Y. tested positive for opiates and cannabis in 2012, and was placed on MAP in 2013 "for making threats towards medical personnel and spitting at them." He also incurred MAP placements in 2015 for multiple infractions including threatening behavior and possession of marijuana and alcohol.

Dr. De Crisce concluded A.Y. suffered from ASPD as evidenced by his repeated behaviors. Noting he "has been described as an angry, irritable, aggressive and controlling individual," A.Y. stated he liked to take risks, and described himself as the type of person who "wants what he wants" and will "go all in." A.Y. "expressed a core belief that violence was necessary to get results and to exert dominance." A.Y. stated: "Once I make my mind up about something man I'm like a bull." Dr. De Crisce considered A.Y.'s rape behaviors

as a function of his ASPD, viewing "these rapes as a function of revenge, rage, antisocial entitlement, and dysfunctional thoughts about women and others."

Dr. De Crisce opined A.Y. also suffered from various substance abuse disorders and Bipolar II Disorder. He noted substance use is a known risk factor for recidivism in individuals with a history of sexual offenses.

Dr. De Crisce found A.Y. has a number of factors that contribute to a high risk of sexual reoffense. He concluded A.Y. still requires therapeutic work to address his risk taking behaviors despite making positive strides in his treatment in the last year.

Dr. De Crisce opined A.Y. "suffers from a mental abnormality and personality disorder that affects his cognitive, volitional, or emotional capacity such that he is highly likely to sexually reoffend if not kept under the care, control and treatment of a secure facility such as the STU." His testimony largely expressed the same findings and conclusions.

Dr. Carmignani prepared a comprehensive annual review report for the Treatment Progress Review Committee (TPRC) in December 2016. The report reviewed A.Y.'s sexual offense history, nonsexual offense history, course of treatment at the STU, institutional infractions, clinical interview, psychological testing results, diagnoses, and clinical formulation and treatment

recommendations. The report states A.Y. is diagnosed with ASPD (with borderline features), Other Specified Paraphilic Disorder (nonconsent) (provisional), Sexual Sadism Disorder (provisional), Cannabis Use Disorder (in a controlled environment), Phencyclidine (PCP) Use Disorder (in a controlled environment), Opioid Use Disorder (in a controlled environment), Alcohol Use Disorder (in a controlled environment), Bipolar Disorder (by history), and PTSD (by history).

The report states A.Y.:

> demonstrates an enduring, pervasive pattern of disregard for and violation of the rights of others that began in adolescence or early adulthood, which is characterized by a failure to conform to social norms with respect to lawful behaviors, deceitfulness, impulsivity, irritability and aggressiveness, reckless disregard for safety of self or others, irresponsibility, and lack of remorse.

Dr. Carmignani opined A.Y. "is highly likely to sexually reoffend at this time if not confined to the STU." Her opinion was "based on his high actuarial estimate, antisocial and psychopathic personality structure, history of sexual preoccupation, and history of violence within intimate relationships, as well as his ongoing negative emotionality, impulsivity, poor judgment, and poor problem solving skills." She also noted A.Y.'s extensive substance abuse. Dr. Carmignani also noted A.Y.'s Static-99R and STABLE-2007 scores placed in

14

the high risk range to sexually recidivate.  The report recommended A.Y. remain in Phase 2 of treatment.  Her testimony largely expressed the same findings and conclusions.

Dr. Barry Zakireh performed a forensic psychosexual evaluation of A.Y. in May 2017.  His report states:

> the evidence overwhelmingly supports the presence of features or symptoms associated . . . with bipolar or severe mood disorder, substance abuse, and antisocial characteristics leading to general criminality, particularly evident in his late adolescence to early adulthood, and no evidence of any significant correlation with paraphilic urges or sexual dynamics.

Dr. Zakireh diagnosed A.Y. with ASPD, Bipolar Disorder, and Substance Abuse Disorders in a controlled environment (alcohol, cannabis, and opiates).  Dr. Zakireh opined a person with ASPD:

> manifests a long-term maladaptive pattern of behavior involving disregard for and violations of the rights of others.  The features of this disorder are expressed in [A.Y.'s] history (since adolescence) of repeatedly performing acts that are grounds for arrest; multiple rule violations or arrests for sexual and nonsexual offenses (criminal versatility); irritability; anger or aggression; impulsivity or poor impulse control (repeated criminal acts despite arrests, sanctions, or supervision); irresponsibility and/or failure to plan in a socially constructive or adaptive manner (e.g., criminal behavior leading or exacerbating interpersonal and social difficulties[)]; reckless disregard for the safety of self or others (placing a victim at significant risk of

harm or maladaptive outcome; sexual offending against a vulnerable female with presence of a child in the residence); and poor empathy. [A.Y.] has showed the above pattern occasionally in significant or extreme ways, and it has been expressed through sexual and nonsexual aggression on multiple occasions over a prolonged period.

Dr. Zakireh found significant evidence of a confounding or corollary mental condition of Bipolar Disorder, which had been treated with "an effective mood stabilizing psychotropic." He concluded the primary motivations or pattern of offending appear to correlate primarily with an antisocial but not paraphilic pathway to sexual offending. He also noted ASPD "involves a diminishing of the intensity or frequency of negative outcomes through aging," particularly in the fourth decade of life.

Dr. Zakireh utilized the Static-2002R to assess actuarial risk of sex offense recidivism, scoring A.Y. at 6, placing him in the above-average risk category. "Beyond the predisposing element of [ASPD]," Dr. Zakireh found insufficient evidence of a mental disorder that results in a serious difficulty controlling harmful sexual behavior such that it is highly likely A.Y. will not control his sexually violent behavior and will reoffend. He concluded A.Y. presents an overall moderate level of risk to sexually reoffend, considering the static, actuarial, and dynamic factors.

Dr. Zakireh testified the Static-2002R had "greater predictive accuracy" than the Static-99R. He said A.Y.'s score of 6 correlated with only a nineteen percent rate over a five-year period. Dr. Zakireh also administered the Static-99 and scored A.Y. at 7. His testimony otherwise largely expressed the findings and conclusions expressed in his report.

Judge Philip M. Freedman rendered a comprehensive oral decision on June 27, 2017, in which he reviewed the testimony, entire documentary record, prior criminal record, prior evaluations, mental health treatment, history of infractions, and controlling case law. The judge recounted A.Y.'s statements during treatment in late 2016 that rejection by women took him to a place of rage and retaliation against them. The judge provided detailed findings regarding the testimony and opinions of Drs. De Crisce and Carmignani, which he credited, and the testimony of Dr. Zakireh, whose theory that A.Y. had reduced his anti-sociality through medications for his Bipolar Disorder he rejected, finding it had "no basis."

Judge Freedman reviewed the records relied upon by the State's experts in reaching their opinions, and found the records to be of the type relied upon by experts in their field. The judge also found the records supported their opinions. In contrast, Judge Freedman concluded A.Y. and his expert substantially

overstated the effect of his use of medication for his Bipolar Disorder on his likelihood to reoffend. While recognizing Abilify renders A.Y. capable of engaging in treatment, Judge Freedman concluded the Abilify "hasn't in any way, shape or form eliminated his need for treatment to deal with his [ASPD] and his . . . problems." He determined A.Y.'s antisocial behavior and predisposition to engage in sexual offending were not caused by his Bipolar Disorder. The judge found A.Y. "clearly needs continued treatment" despite the improvement in his Bipolar Disorder through medication, agreeing with Dr. DeCrisce's opinion that A.Y.'s Bipolar Disorder "is incidental to his presentation and not the basis of it." The judge noted Dr. Zakireh acknowledged that Bipolar Disorder does not predispose a bipolar individual to commit sexually violent offenses. He further noted Dr. Zakireh conceded A.Y.'s Bipolar Disorder was peripheral to his sexual offending, A.Y. was still predisposed to engage in acts of sexual violence by his ASPD, and A.Y. would have far more maladaptive behaviors if he did not take his medications.

Judge Freedman concluded A.Y. had "not made that much treatment progress," was still in Phase 2, still needed to develop relapse prevention by completing relapse prevention 2 and 3, and still needed extensive substance

abuse treatment. He viewed A.Y. as "far from being ready for a conditional discharge."

The judge found the State clearly and convincingly proved its case for civil commitment. Based on the expert testimony of the State's witnesses, Judge Freedman found by clear and convincing evidence that A.Y. suffers from a mental abnormality in the form of substance abuse disorders and a personality disorder involving antisocial traits, which "predisposes him to engage in acts of sexual violence." The judge further found A.Y. "would have serious difficulty controlling his sexually violent behavior in the community." He also found A.Y. "would be highly likely to return to drug use, which would disinhibit him" and make his anti-sociality "even worse." Judge Freedman concluded A.Y. would not be highly likely to comply with conditions of a conditional discharge, noting even A.Y.'s expert "could not testify to that."

Judge Freedman determined A.Y. "continues to be a sexually violent predator in need of civil commitment in a secure facility for control, care, and treatment," who is "highly likely to engage in acts of sexual violence" for "the foreseeable future." Judgment was entered committing A.Y. to the STU. This appeal followed.

A.Y. raises the following issues on appeal:

POINT I
THE TRIAL JUDGE CLEARLY ERRED WHEN HE ASSESSED A.Y.'S RISK OF REOFENDING WITHOUT ADDRESSING THAT HE NOW HAS VOLITIONAL CONTROL OVER HIS SEXUALLY ASSAULTIVE BEHAVIOR THROUGH HIS SUCCESSFUL TREATMENT AT THE STU.

POINT II
A.Y.'S COMMITMENT IS IMPROPERLY BASED ON STATE EXPERTS' INADMISSABLE NET OPINION TESTIMONY.

A. Neither State Expert Could Provide Any Probability Basis to Find A.Y. "Highly Likely" to Reoffend.

B. The Static-99 Risk Assessment Tool Demonstrated that [A.Y.'s] Risk of Sexually Reoffending Was Below 50%.

C. The State Experts Could Not Point to Any Methodology Or Objective Standards Used to Reach Their Finding.

D. Both State Experts Ignored Base Rate Data that Was Relevant to Determine [A..Y.'s] Risk of Reoffending.

E. The State Experts Failed to Correlate [A.Y.'s] PCL-R Score with Finding He Was Highly Likely to Reoffend.

F. The State Experts Failed to Correlate Any STABLE-2007 Score with Finding [A.Y.] Highly Likely to Reoffend.

G. Dr. Zakireh, A.Y.'s Expert, Was the Only Witness Who Used An Empirically Validated Risk Assessment.

A-5240-16T5

We have considered these arguments and find they lack merit.

Our "review of a commitment determination is extremely narrow." R.F., 217 N.J. at 174 (quoting In re D.C., 146 N.J. 31, 58 (1996)). "The judges who hear SVPA cases are generally 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" Ibid. (quoting In re Civil Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)). "We give deference to the findings of our trial judges because they have the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Ibid. (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "Accordingly, an appellate court should not modify a trial court's determination either to commit or release an individual unless 'the record reveals a clear mistake.'" Id. at 175 (quoting D.C., 146 N.J. at 58). "So long as the trial court's findings are supported by 'sufficient credible evidence present in the record,' those findings should not be disturbed." Ibid. (quoting Johnson, 42 N.J. at 162).

The State is, as a general matter, entitled to call experts on the subject of commitment and, to the extent the information the experts relied upon is of a type reasonably relied upon by experts in that field, the State can prove the grounds for commitment without calling as a witness each person who provided information upon which the expert relied. In re Civil Commitment of W.X.C.,

407 N.J. Super. 619, 641 (App. Div. 2009), aff'd on other grounds, 204 N.J. 179 (2010); see also State v. Torres, 183 N.J. 554, 576 (2005); N.J.R.E. 703. Prior expert opinions are admissible, not as substantive evidence, but as a basis for the expert's opinion. In re Commitment of E.S.T., 371 N.J. Super. 562, 576 (App. Div. 2004).

However, the trial judge conducting an initial hearing is "not required to accept all or any part of" an expert's opinion. R.F., 217 N.J. at 174 (quoting D.C., 146 N.J. at 61). That is because the ultimate determination is "'a legal one, not a medical one, even though it is guided by medical expert testimony.'" Ibid. (quoting D.C., 146 N.J. at 59). "The final decision whether a person previously convicted of a sexually violent offense is highly likely to sexually reoffend 'lies with the courts, not the expertise of psychiatrists and psychologists. Courts must balance society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy.'" Ibid. (quoting D.C., 146 N.J. at 59).

Governed by these standards, we discern no basis to disturb Judge Freedman's decision. First, it is not necessary that an individual suffer from a mental abnormality to be deemed a sexually violent predator under the SVPA. A personality disorder alone may be used as a basis to conclude that one has a

predisposition to sexually reoffend.   See N.J.S.A. 30:4-27.26 (defining a "sexually violent predator," in part, as a person who "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment") (emphasis added); see also W.Z., 173 N.J. at 129.  It is also not necessary that an individual have a sexual compulsion, such as paraphilia, or a complete or total loss of control over his or her behavior to be deemed a sexually violent predator under the SVPA.  W.Z., 173 N.J. at 129.  Rather, the individual must be unable to control his or her sexually violent behavior.  Ibid.  However, "the diagnosis of each sexually violent predator susceptible to civil commitment need not include a diagnosis of 'sexual compulsion.'"  Ibid.

In our view, the credible evidence in the record amply supports Judge Freedman's findings that A.Y. presently suffers from ASPD, which makes it highly likely he will not control his sexually violent behavior and will reoffend if not confined to the STU for treatment.  Even though A.Y. was not diagnosed with a form of paraphilia, the State's experts diagnosed him with severe ASPD that affected him emotionally, cognitively, or volitionally so as to predispose him to engage in acts of sexual violence.  Judge Freedman found the State's experts opined, credibly, that as a result of his personality disorder, it was highly

23                                    A-5240-16T5

likely that A.Y. would sexually reoffend if not confined to the STU for control, care, and treatment. We discern no basis to overturn his determination.

A.Y. argues the State's experts' testimony amounted to inadmissible net opinions because they gave no empirical basis for their conclusion that A.Y. was highly likely to reoffend. Pointing to the results of one actuarial instrument, A.Y. claims the State's experts provided no evidence he has more than a fifty-one percent risk of sexually reoffending. A.Y. asserts the State's experts failed to address the base rate of sexual recidivism among individuals similar to A.Y., noting one study found the overall sexual recidivism rate was only 13.5 percent. He also contends neither State expert described their methodology or showed any reliability in their findings. He argues our Supreme Court's recent decision in In re Accutane Litig., 234 N.J. 340 (2018), which adopted the factors set forth in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), requires the reversal of the trial court's refusal to strike the testimony of the State's experts as inadmissible net opinions. We are unpersuaded by these arguments.

When reviewing an evidentiary ruling whether to bar expert testimony, we apply considerable deference to the trial court and generally do not disturb the trial court's decision unless the ruling demonstrably comprises an abuse of discretion. Hisenaj v. Kuehner, 194 N.J. 6, 16 (2008); see also Townsend v.

Pierre, 221 N.J. 36, 52-53 (2015) (noting the decision to admit or exclude expert testimony is "committed to the sound discretion of the trial court") (citing State v. Berry, 140 N.J. 280, 293 (1995)).

"An expert may not provide an opinion at trial that constitutes 'mere net opinion.'" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011)). The net opinion rule bars admission "of an expert's conclusions that are not supported by factual evidence or other data." Townsend, 221 N.J. at 53-54 (quoting Polzo v. Cty. of Essex, 196 N.J. 569, 583 (2008)). The expert must provide the factual basis and analysis that support the opinion, rather than stating a mere conclusion. Davis, 219 N.J. at 410. Courts "may not rely on expert testimony that lacks an appropriate factual foundation and fails to establish the existence of any standard about which the expert testified." Ibid. (quoting Pomerantz Paper, 207 N.J. at 373).

The net opinion rule does not require experts to organize or support their opinions in a specific manner "that opposing counsel deems preferable." Townsend, 221 N.J. at 54. Consequently, "[a]n expert's proposed testimony should not be excluded merely 'because it fails to account for some particular condition or fact which the adversary considers relevant.'" Ibid. (quoting

Creanga v. Jardal, 185 N.J. 345, 360 (2005)). An expert's failure "to give weight to a factor thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers sufficient reasons which logically support his opinion." Ibid. (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 402 (App. Div. 2002)). Instead, such omissions may be subjected to exploration and searching cross-examination at trial. Id. at 54-55.

Even so, the net opinion doctrine requires experts to "be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are [scientifically] reliable." Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)).

In Accutane, the Court explained trial courts perform their "gatekeeping role" to assure reliability of expert scientific testimony by requiring experts "to demonstrate" they applied "scientifically recognized methodology in the way that others in the field practice the methodology." 234 N.J. at 399-400. Thus, "[w]hen a proponent does not demonstrate the soundness of a methodology, both in terms of its approach to reasoning and to its use of data, from the perspective of others within the relevant scientific community, the gatekeeper should

exclude the proposed expert testimony on the basis that it is unreliable." Id. at 400.

With regard to quantifying the likelihood of A.Y. sexually reoffending, Dr. De Crisce did not calculate a recidivism rate for him and Dr. Carmignani did not quantify his risk of reoffending by assigning a percentage rate. Judge Freedman noted that in Kansas v. Crane, the United States Supreme Court recognized "that in cases where lack of control is at issue, 'inability to control behavior' will not be demonstrable with mathematical precision." 534 U.S. 407, 413 (2002). The Court declined to establish a precise standard for the degree of "lack of control" that must be proven, stating only "there must be proof of serious difficulty in controlling behavior." Ibid. Our Supreme Court likewise did not impose a technical meaning or quantitative threshold, holding "the State must prove by clear and convincing evidence . . . it is highly likely that the person will not control his or her sexually violent behavior and will reoffend." W.Z., 173 N.J. at 133-34.

Both of the State's experts interviewed A.Y. extensively and relied on prior evaluations, treatment records, other appropriate documents, and actuarial instruments that supported their conclusions. The State's experts provided the factual bases for their conclusions and explained the methodologies they

employed. Although their conclusions differ from those of A.Y.'s expert, their conclusions were not net opinions. Their testimony confirmed their opinions were based on a comprehensive review of data and information of the type relied upon by others in their scientific community, including the MnSOST-R and Static-99R actuarial instruments.

The MnSOST-R and Static-99R "assessment tools are based upon static factors, which are elements of a person's history which cannot be changed, as opposed to dynamic factors, which are elements which can be modified over time." J.P., 339 N.J. Super. at 451.

The MnSOST-R "measures sexual recidivism by taking into account certain static factors (historical facts that do not change over time) and attempts to capture certain dynamic factors (such as an individual's participation in treatment)." In re Civil Commitment of M.L.V., 388 N.J. Super. 454, 460 n.1 (App. Div. 2006) (citing In re Commitment of R.S., 339 N.J. Super. 507, 517-19 (App. Div. 2001), aff'd o.b., 173 N.J. 134 (2002)). "The MnSOST-R carries a possible total score of thirty-one, with a high score being the worst. Any score of eight or above denotes a 70% recidivism rate and a 'possible' commitment." E.S.T., 371 N.J. Super. at 569 n.3. A.Y. scored a +10 on the MnSOST-R, placing him in the high risk category for sexual reoffending.

The Static-99R is used to predict sexual recidivism. M.L.V., 388 N.J. Super. at 460 n.1. "The Static-99 was designed to predict long-range risk for sexual recidivism by combining two well standardized risk assessment scales." J.P., 339 N.J. Super. at 451. "Research has shown" the test's "predictive power is increased" "by combining the factors tapped by these two scales." Ibid. The Static-99 is a recognized actuarial test used to estimate the probability of sexually violent recidivism. R.F., 217 N.J. at 164 n.9. A.Y. scored a 5 on the Static-99, placing him in the moderate-high risk category for sexual reoffending.

In In re Registrant, C.A., the Court stated scientific literature has shown "the use of actuarial concrete predictors is at least as good, if not in most cases better, in terms of reliability and predictability than clinical interviews." 146 N.J. 71, 106 (1996). Allocating weight to risk factors in accordance with scientific literature and expertise was held an acceptable method of predicting future criminal sexual behavior. Id. at 105.

In R.S., we concluded "the use of actuarial instruments is generally accepted by professionals who assess sex offenders for risks of reoffense." 339 N.J. Super. at 538. We noted "there is support in scientific literature . . . for the use of these instruments; and that actuarial instruments have been accepted by the courts of at least six other states." Id. at 548. We held "actuarial instruments

satisfy the Frye[4] test and are admissible for consideration by the State's experts" at SVPA proceedings "as a factor in the overall prediction process." Id. at 534, 548. Our Supreme Court agreed, holding actuarial risk assessment instruments are admissible in SVPA commitment hearings "when such tools are used in the formation of the basis for a testifying expert's opinion concerning the future dangerousness of a sex offender." R.S., 173 N.J. at 137. In a decision announced the same day, the Court rejected "contentions concerning the unreliability of those actuarial instruments." W.Z, 173 N.J. at 133. Actuarial information, including the Static-99, is "simply a factor to consider, weigh, or even reject, when engaging in the necessary factfinding under the SVPA." R.F., 217 N.J. at 164 n.9 (quoting R.S., 173 N.J. at 137).

The methodology utilized by the State's experts satisfied the requirements imposed by the Court in Accutane. We discern no abuse of discretion by the trial court in admitting and considering the testimony of Drs. De Crisce and Carmignani, including their use of and reliance upon the MnSOST-R and Static-99R actuarial instruments.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[4] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).