# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5131-17T5

IN THE MATTER OF THE CIVIL
COMMITMENT OF J.D.,
SVP-668-13.

_____

Argued telephonically May 28, 2020 –
Decided June 23, 2020

Before Judges Koblitz, Whipple and Mawla.

On appeal from the Superior Court of New Jersey, Law
Division, Essex County, Docket No. SVP-668-13.

Susan Remis Silver, Assistant Deputy Public Defender,
argued the cause for appellant J.D. (Joseph E. Krakora,
Public Defender; Susan Remis Silver, on the briefs).

Victoria Renee Ply, Deputy Attorney General, argued
the cause for respondent State of New Jersey (Gurbir S.
Grewal, Attorney General, attorney; Melissa H. Raksa,
Assistant Attorney General, of counsel; Victoria Renee
Ply, on the brief).

PER CURIAM

J.D. appeals from a January 28, 2019 order committing him to the State of New Jersey Special Treatment Unit (STU) for the custody, care, and treatment of sexually violent predators. We affirm.

We previously addressed the background of this case when we affirmed J.D.'s challenge to being returned to the STU. We stated:

> On November 6, 2009, when [J.D.] was seventeen-years-old, he pled guilty to one count of aggravated sexual assault, N.J.S.A. 2C:14–2, for having "sexual relations" with a child less than thirteen years old in a church bathroom, and one count of unlawful possession of a knife, N.J.S.A. 2C:39–5(d), stemming from an incident where J.D. had a knife in the presence of his father. He received a three-year suspended sentence, conditioned upon his completion of a residential treatment program and all aftercare recommendations, and three years' probation. [J.D.] violated probation when he was terminated from residential treatment, and as a result, he was sent to New Jersey Training School for Boys (Jamesburg). In May 2011, [J.D.] was transferred from Jamesburg to the Adult Diagnostic and Treatment Center (ADTC).
>
> The clinical certificates of two psychiatrists dated March 4, 2013, diagnosed [J.D.] with Sexual Disorder NOS (Not Otherwise Specific) and Dysthymia (Persistent Depressive Disorder). The trial judge issued a temporary commitment order[] based upon the certificates, and on July 30, 2014, the trial judge ordered [J.D.] be committed to the [STU].
>
> [J.D.]'s pleas and sentence were vacated on July 1, 2015, after he filed for post-conviction relief because he had not been adequately informed his pleas could

lead to his involuntary commitment. The 2013 petition for civil commitment was dismissed without prejudice on July 2, 2015, because the sexual assault conviction had been vacated. [J.D.] pled to two aggravated sexual assault charges in January of 2016, and the State filed an Amended Petition for Commitment under the Sexual Violent Predator Act (SVPA)[1] on February 24, 2016, seeking commitment, or "in the alternative, since probable cause has been established that [J.D.] is a sexually violent predator, an order should be entered for [him] to be taken to a psychiatric hospital for five days so that he may be evaluated for SVP commitment."[] At the State's request, the trial court reopened the commitment proceedings by vacating the July 2, 2015 order dismissing the original commitment petition. On February 29, 2016, the trial court sentenced [J.D.] to a three-year, time-served sentence.

[J.D.] was then transported to the STU. [There, two doctors] attempted to evaluate [J.D.] when he was transported to the STU, but he declined to be interviewed by either doctor. Both doctors reviewed [J.D.'s] records, which included reports as recent as 2015 and provided detailed clinical certificates. Both doctors diagnosed [J.D.] with Pedophilic Disorder, other Specified Paraphilic Disorder–Non–Consent, and Antisocial Personality Disorder–Severe.

The certificates were provided to the court in a hearing on March 1, 2016. [J.D.]'s counsel was notified just thirty minutes prior to the hearing but was in attendance along with [J.D.] After reviewing the record, the trial judge then issued a Temporary Commitment Order. . . .

---

[1] N.J.S.A. 30:4–27.24 to –27.38.

[Matter of the Civil Commitment of J.D., No. A-2495-15 (slip. op. at 1-4) (App. Div. Dec. 1, 2016).]

We concluded the State presented evidence warranting J.D.'s commitment because he stipulated to the finding when the court entered the temporary commitment order, declined to be interviewed by medical personnel when he was transferred to the STU, and the State presented two current psychiatric certificates detailing his serious, ongoing difficulty controlling his sexual behavior and high likelihood of re-offending. Id. (slip op. at 6-7).

This appeal arises from J.D.'s initial commitment hearing, which occurred during three days in October and November 2018. Prior to the hearing, J.D. filed a motion for a Rule 104 hearing to bar the testimony of the State's psychiatrist and the psychologist who evaluated him. The trial judge denied the motion without a hearing. At the subsequent commitment hearing, the State presented the testimony of both doctors, and J.D. presented the testimony of a neuropsychologist and a psychologist. The judge granted the State's request to commit J.D. to the STU setting forth his findings in a 104-page oral decision, which we summarize here.

The judge recited J.D.'s long history of offenses, including convictions for aggravated sexual assault, two temporary commitments to the STU in 2013 and 2016, and his admission to "a number of very serious sexual offenses," which

4

included ten to eleven known victims and potentially as many as fifteen. The judge recounted that J.D. began sexually offending at the age of six, including committing a sexually violent offense against his father. J.D. acted out sexually while in treatment, admitted he would re-offend if given the opportunity, and his prognosis in treatment was poor because he showed no remorse, guilt, motivation, or willingness to change his behavior. The judge found no evidence J.D. could control his urges, and that he had lied his way through his psychological and psychiatric evaluations, both of which concluded he needed to be in a highly structured treatment facility.

Based on the expert testimony, the trial judge concluded J.D. suffered from serious developmental problems and paraphilia prior to puberty. He found the evidence supported a finding that J.D. suffered from borderline personality traits and anti-social personality disorder, and J.D.'s pedophilia represented a continuation of his disorders. The judge concluded treatment did not succeed because J.D. did not comply and exhibited out of control behavior.

J.D. raises the following points on this appeal:

> POINT I - THE TRIAL COURT ERRED WHEN IT DENIED A RULE 104 HEARING.
>
> POINT II - THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT QUALIFIED THE STATE DOCTORS AS EXPERTS WHEN THEY BOTH

LACKED ANY SPECIALIZED KNOWLEDGE ON THE SEXUAL RECIDIVISM RISK OF AN ADULT WHO ONLY SEXUALLY OFFENDED AS A JUVENILE.

POINT III - THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT QUALIFIED [THE STATE'S DOCTORS] AS EXPERTS WITHOUT THE STATE PROVING THEY USED A RELIABLE RISK ASSESSMENT METHOD TO ASSESS AN ADULT, LIKE J.D., WHO ONLY SEXUALLY OFFENDED AS A JUVENILE.

POINT IV - THE TRIAL COURT VIOLATED J.D.'S 8TH AMENDMENT AND DUE PROCESS RIGHTS BECAUSE IT FAILED TO RECOGNIZE THAT J.D. PRESENTED A REDUCED RECIDIVI[S]M RISK AS HE STOOD BEFORE THE COURT BECAUSE HE ONLY OFFENDED AS A JUVENILE.

POINT V - THIS COURT MUST REVERSE BECAUSE THE TRIAL COURT COMMITTED J.D. BASED ON CLEAR MISTAKES ABOUT EVIDENCE IN THE RECORD.

I.

Our scope of review of a judgment for commitment under the SVPA "is extremely narrow." In re Civil Commitment of R.F., 217 N.J. 152, 174 (2014) (quoting In re D.C., 146 N.J. 31, 58 (1996)). "We give deference to the findings of our trial judges because they have the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Ibid. (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Moreover,

A-5131-17T5

"[t]he judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'"  Ibid. (quoting In re Civil Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)).  Thus, "[s]o long as the trial court's findings are supported by 'sufficient credible evidence present in the record,' those findings should not be disturbed."  Ibid. (quoting Johnson, 42 N.J. at 162).

We also afford great deference to a trial court's evidentiary rulings and "generally do not disturb the trial court's decision unless the ruling demonstrably comprises an abuse of discretion."  In re Commitment of A.Y., 458 N.J. Super. 147, 169 (App. Div. 2019) (citing Hisenaj v. Kuehner, 194 N.J. 6, 16 (2008)); see also In re Commitment of R.S., 339 N.J. Super. 507, 531 (App. Div. 2001). We will not substitute our own judgment for the trial court's "unless 'the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" State v. Brown, 170 N.J. 138, 147 (2001) (citing State v. Marrero, 148 N.J. 469, 484 (1997)).

> The SVPA permits the State to involuntarily commit "a person who has been convicted . . . of a sexually violent offense" who "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care, and treatment.  N.J.S.A. 30:4-27.26.  At the commitment hearing, the State must establish three elements: (1) that

7

the individual has been convicted of a sexually violent offense, ibid., (2) that he suffers from a mental abnormality or personality disorder, ibid., and (3) that as a result of his psychiatric abnormality or disorder, "it is highly likely that the individual will not control his or her sexually violent behavior and will reoffend." In re Commitment of W.Z., 173 N.J. 109, 130 (2002).

[In re Civil Commitment of R.F., 217 N.J. at 173.]

The State bears the burden of proving these elements by clear and convincing evidence. Ibid.

### A.

J.D. argues that the denial of a Rule 104 hearing deprived him of the opportunity to prove the assessment tools the State's experts utilized were invalid because they were normed to adult offenders, whereas J.D.'s offenses were committed when he was a juvenile. J.D. asserts the State did not establish a credible scientific basis to assess the risk of recidivism by juvenile-only sex offenders, and the evidence did not support the decision to commit him to the STU.

The decision whether to conduct a Rule 104 hearing is discretionary. See Townsend v. Pierre, 221 N.J. 36, 54 n.5 (2015). Although the better practice is to address the admissibility of an expert's testimony at such a hearing, we have held it is not reversible error to decline to do so where an expert is examined at

length during the trial itself.  Fairfax Fin. Holdings Ltd. v. S.A.C. Capital Mgmt., L.L.C., 450 N.J. Super. 1, 100 n.50 (App. Div. 2017).

We discern no reversible error here because the judge heard from all four experts and was able to assess their credibility and compare their methodologies prior to deciding J.D.'s commitment.  Moreover, J.D.'s counsel was able to cross-examine the State's experts at length over the course of three days.

B.

J.D. argues the trial judge erred in qualifying the State's experts because they had insufficient expertise to assess the risk of a juvenile-only sex offender. He also argues the judge made no finding as to the validity of the assessment methodology the State's experts used to conclude J.D. was at high risk of reoffending.

N.J.R.E. 702 requires an expert possess "specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." An expert must be "'suitably qualified and possessed of sufficient specialized knowledge to be able to express [an expert opinion] and to explain the basis of that opinion.'"  Agha v. Feiner, 198 N.J. 50, 62 (2009) (alteration in original) (quoting State v. Moore, 122 N.J. 420, 458-59 (1991)).  SVPA commitment requires that a "psychiatrist . . . testify at the hearing to the clinical basis for the

need for involuntary commitment as a sexually violent predator." N.J.S.A. 30:4-27.30.

The record does not support J.D.'s argument that the State's experts were unqualified to offer an opinion under N.J.S.A. 30:4-27.30. Both witnesses were previously qualified as experts in several other commitment hearings. The State's psychiatrist testified at length regarding his professional training and extensive history of assessing juvenile-only offenders and their risks to reoffend. The State's psychologist also addressed the current research related to juvenile sex offenders and testified his practice outside of the STU included a significant number of juvenile sex offenders. See State v. Townsend, 186 N.J. 473, 495 (2006) (holding a clinical psychologist with several years of clinical experience counseling battered women qualified to testify from occupational experience regarding the effects of battering on women who were not diagnosed with battered women's syndrome).

We also reject J.D.'s argument that the methodology utilized to assess his likelihood of re-offense was unsound and inadmissible pursuant to In re Accutane Litig., 234 N.J. 340 (2018). We have stated:

> In Accutane, the Court explained trial courts perform their "gatekeeping role" to assure reliability of expert scientific testimony by requiring experts "to demonstrate" they applied "scientifically recognized

methodology in the way that others in the field practice the methodology." 234 N.J. at 399-400. Thus, "[w]hen a proponent does not demonstrate the soundness of a methodology, both in terms of its approach to reasoning and to its use of data, from the perspective of others within the relevant scientific community, the gatekeeper should exclude the proposed expert testimony on the basis that it is unreliable." Id. at 400.

[A.Y., 458 N.J. Super. at 170.]

"'[T]he use of actuarial instruments is generally accepted by professionals who assess sex offenders for risks of reoffense.'" Id. at 172 (quoting In re Commitment of R.S., 339 N.J. Super. at 538). "[A]ctuarial risk assessment instruments are admissible in SVPA commitment hearings 'when such tools are used in the formation of the basis for a testifying expert's opinion concerning the future dangerousness of a sex offender.'" Id. at 137 (quoting In re Commitment of R.S., 173 N.J. at 137). The testifying expert may utilize such instruments to explain "how he or she reached a conclusion concerning an individual's risk assessment . . . a testifying expert now may rely on actuarial as well as clinical information when formulating an opinion concerning future dangerousness" of a sex offender. In re Commitment of R.S., 173 N.J. at 137.

At the outset, we note J.D.'s and the State's experts agreed there was no instrument available to predict risk in adults who committed sex offenses as juveniles and relied on other factors to form their opinions. The State's

11

psychiatrist based his opinion on the clinical certificates, pre-sentence investigation reports, forensic evaluations, progress notes, Treatment Progress Review Committee reports, other experts' reports, and his three clinical interviews with J.D. over the preceding two years. The State psychologist relied on his evaluation of J.D., scholarship in the field of childhood sexuality, and J.D.'s trajectory throughout the time he spent in different treatment programs, including the various degrees of restriction imposed on him in these programs. The psychologist also referenced the commonly utilized risk assessment based instruments Stable 2007 and SVR-20.[2]  Although these instruments were not normed to juveniles, the psychologist testified they were only used as a way to organize and structure his analysis of the risk factors present in J.D.'s case.

The record supports the judge's finding the State's experts were qualified to testify and utilized valid risk assessment methods.  Contrary to J.D.'s arguments, even without a risk assessment tool or literature assessing the commitment of an adult whose offenses were committed as a juvenile, ample evidence supported finding J.D. was at high risk of re-offense based upon the clinical, treatment, and numerous evaluations documenting his behavior.

---

[2]  Sexual Violence Risk-20.

## C.

J.D. asserts the failure to consider the different risk factors of juvenile and adult sex offending and that juvenile-only sex offenders have a lower recidivism rate than adult offenders, was a violation of his constitutional rights because the court's decision ostensibly imposed a lifelong restriction. J.D. argues the judge failed to credit his experts' testimony regarding the low re-offense rate of juvenile-only offenders.

We reject J.D.'s constitutional challenge for the same reasons as the trial judge. As the judge stated, J.D.'s commitment is fundamentally different than a life sentence because "civil commitment has an annual review and people are not only encouraged to change but clearly can show they've changed . . . at review hearings or initial hearings."

The judge was free to accept part or all of the expert testimony offered on J.D.'s behalf. Torres v. Schripps, Inc., 342 N.J. Super. 419, 430-31 (App. Div. 2001). A factfinder is not bound to accept the testimony of an expert witness, even if it is unrebutted by any other evidence. Johnson v. Am. Homestead Mortgage Corp., 306 N.J. Super. 429, 438 (App. Div. 1997).

The trial judge gave ample reasons for rejecting the expert testimony offered on behalf of J.D. including the opinion that J.D. had a lower likelihood

A-5131-17T5

of re-offense because he offended as a juvenile. He noted J.D.'s experts improperly discounted the sexual offenses J.D. committed against certain victims. The judge rejected the experts' theory that J.D.'s offenses were the product of juvenile experimentation noting "the experimentation didn't continue . . . it crossed over into a mental abnormality that predisposes him." The judge found the experts' theory that J.D. could not be diagnosed with a personality disorder was unsupported by the DSM-5.

The record contained evidence of J.D.'s likelihood to offend. At twenty years old, J.D. told an evaluator he was masturbating to fantasies of "young boys." The State psychiatrist noted the record indicated in spite of being in essentially a twenty-four-hour supervised setting at the ADTC, J.D. "acted out with other inmates," "danc[ed], hump[ed] the floor, [sang] about [oral sex]," and "peek[ed] and masturbate[ed] in the showers." The psychiatrist testified J.D. was placed on treatment refusal status in April 2018 and refused to participate in discussion. J.D. exhibited a disordered personality throughout his institutionalizations, not just as a juvenile. He refused to participate in treatment for several years.

The judge concluded that J.D.'s mental abnormalities predisposed him to engage in acts of sexual violence, and if released, he would have difficulty

A-5131-17T5

controlling his behavior and would likely engage in acts of sexual violence. Adequate, substantial and credible evidence in this record supported the judge's conclusion that the State clearly and convincingly proved J.D. should remain committed.

## D.

Finally, J.D. alleges the judge misread the documentary evidence, and misinterpreted both the expert testimony and J.D.'s psychiatric and psychological diagnoses. We thoroughly reviewed the record and are convinced these arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). The trial judge's misstatement that J.D. was discharged from a treatment facility one month before his nineteenth birthday, when in fact his discharge occurred one month before his eighteenth birthday was not reversible error. R. 2:10-2. Substantial evidence in the record supported J.D.'s commitment.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5131-17T5