# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0336-18T5

IN THE MATTER OF THE CIVIL
COMMITMENT OF F.Z.S.,
SVP-393-05.

_____

Argued September 25, 2019 – Decided October 31, 2019

Before Judges Koblitz and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. SVP-393-05.

Susan Remis Silver, Assistant Deputy Public Defender, argued the cause for appellant F.Z.S. (Joseph E. Krakora, Public Defender, attorney; Susan Remis Silver, on the briefs).

Stephen J. Slocum, Deputy Attorney General, argued the cause for respondent State of New Jersey (Gurbir S. Grewel, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Stephen J. Slocum, on the brief).

PER CURIAM

F.Z.S., born February 1949, appeals from the September 5, 2018 Law

Division order continuing his civil commitment to the Special Treatment Unit

(STU), the secure facility designated for the custody, care, and treatment of sexually violent predators committed pursuant to the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. We affirm.

An involuntary civil commitment can follow service of a sentence, or other criminal disposition, for "a sexually violent offense," including sexual assault, when the offender "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." N.J.S.A. 30:4-27.26. See also N.J.S.A. 30:4-27.25. Annual review hearings to determine whether the person remains in need of commitment, despite treatment, are required. N.J.S.A. 30:4-27.35.

Following his incarceration for a sexually violent offense, F.Z.S. was civilly committed in 2005 to the STU pursuant to the SVPA. Since that time, F.Z.S.'s commitment has been reexamined at annual review hearings. In each instance, the trial court has determined that F.Z.S. continues to meet the SVPA's criteria for civil commitment and, on appeal, we have affirmed that

determination.[1] This is F.Z.S.'s seventh appeal of his commitment following a review hearing conducted on May 29, 2018.

We need not recount at length F.Z.S.'s past history of sexually violent conduct and aberrational sexual behavior. We incorporate the facts and procedural history set forth in our six prior unpublished decisions, which have conclusively established as the law of the case that F.Z.S. committed the predicate sexually violent offense required under the SVPA. See State v. Reldan, 100 N.J. 187, 203 (1985) (reciting elements of the law of the case doctrine). Briefly, F.Z.S. was first convicted of a sexually violent offense based on evidence that he sexually assaulted his step-daughter from 1973 to 1984 by engaging in multiple sexual acts, including fondling and sexual intercourse, while she was between four and fifteen years of age. When F.Z.S.'s then wife and mother of the victim eventually discovered F.Z.S. naked in her daughter's bedroom, F.Z.S. threatened the victim and her mother with a gun if they reported

---

[1] In re the Civil Commitment of F.Z.S., No. A-0625-05 (App. Div. Dec. 15, 2006); In re the Civil Commitment of F.Z.S., No. A-4611-06 (App. Div. Jan. 14, 2008); In re the Civil Commitment of F.Z.S., No. A-6207-07 (App. Div. Jan. 9, 2009); In re the Civil Commitment of F.S., No. A-3325-11 (App. Div. June 11, 2012); In re the Civil Commitment of F.Z.S., No. A-5009-12 (App. Div. Dec. 19, 2013); In re Civil Commitment of F.S., No. A-0912-15 (App. Div. July 19, 2016).

him.  F.Z.S. ultimately pled guilty in 1984 to second-degree sexual assault of his step-daughter and was sentenced to a seven-year State prison term.

F.Z.S.'s second conviction for a sexually violent offense was based on evidence that he sexually assaulted an underage family friend, with whose family he had been living from 1992 to 1996, by engaging in multiple sex acts, including digital and penile penetration, when the victim was between six and nine years old.  F.Z.S. threatened to kill the victim if she told anyone.  The molestation was discovered when the victim was diagnosed with genital herpes and hospitalized for suicidal ideation.  Following a 2002 jury trial on the related charges, F.Z.S. was convicted of first-degree aggravated sexual assault, second-degree sexual assault, fourth-degree child endangerment, and fourth-degree child neglect.  He was sentenced to eighteen years of imprisonment, with a nine-year parole disqualifier.  In 2004, F.Z.S.'s convictions were overturned on appeal, resulting in his guilty plea in 2005 to second-degree child endangerment for which he received a five-year State prison sentence.

Additionally, F.Z.S. was charged with attempted rape in 1975, but the charge was later downgraded to simple assault.  Ultimately, F.Z.S. pled guilty to soliciting prostitution and received a suspended sentence, claiming that the charge arose over a monetary dispute with a prostitute.  Also, F.Z.S.'s non-sexual

4

offending history included a 1977 conviction for resisting an officer, for which he received a suspended sentence, and a 1996 conviction for harassment, downgraded from terroristic threats.

At the review hearing, which is the subject of this appeal, the State presented two expert witnesses, Dr. Marta Scott, a psychiatrist who conducted a forensic evaluation, including an interview of F.Z.S. on January 30, 2018, and Dr. Zachary Yeoman, a psychologist and member of the Treatment Progress Review Committee (TPRC)[2] that conducted F.Z.S.'s annual review on April 3, 2018. Relying on their evaluations and review of the type of information relied upon by others in their scientific community, both State experts testified in favor of continued commitment. F.Z.S. presented the testimony of Dr. Timothy Foley, a psychologist. After conducting an evaluation, which included interviewing F.Z.S. on September 27, 2017, Foley recommended that F.Z.S. be released to a supervised setting in the community. All three experts' qualifications were accepted without objection, and their reports as well as various treatment notes relied upon in formulating their opinions were admitted into evidence.

---

[2] The members of the TPRC are psychologists responsible for reviewing the progress and treatment of persons committed to the STU.

Both State experts agreed that F.Z.S. suffered from a mental abnormality and personality disorder, which predisposed him to sexually reoffend. They diagnosed F.Z.S. with pedophilic disorder, non-exclusive type, sexually attracted to females; other specified personality disorder, with anti-social traits; and alcohol use disorder, severe, in a controlled environment. F.Z.S.'s diagnoses were predicated upon his protracted sexual molestation of two pre-pubescent females, his "pervasive pattern of maladaptive behaviors" demonstrated by his "disrespect [of] social norms," "disregard for the well-being of others," and "lack of remorse," as well as his problematic pattern of excessive alcohol use since adolescence, including alcohol use at the time of his sex offenses. Both experts opined that these conditions affect F.Z.S. emotionally, cognitively, and volitionally, cause him to have serious difficulty controlling his sexual offending behavior, and do not spontaneously remit but require treatment interventions to control and mitigate the associated risks. They agreed that, to date, F.Z.S. has not been able to adequately reduce his risks through treatment.

Additionally, both State experts scored F.Z.S. as "1" on the Static-99R,[3] placing him in the "[a]verage [r]isk" range to sexually reoffend "compare[d] to

---

[3] "The Static-99 is an actuarial test used to estimate the probability of sexually violent recidivism in adult males previously convicted of sexually violent

6

other sex offenders."[4] Scott explained that a Static-99R score reflects "a relative estimate[,]" rather than F.Z.S.'s "individual risk," and, "as such, is really not an absolute guide for overall risk measurement[,]" or "accepted to be used as a sole way of reoffense assessment." In F.Z.S.'s case, Scott identified at least eight "additional risk factors," including (1) "a history of substance abuse," (2) "a strong deviant arousal, in that he repeatedly offended against his victims under circumstances when detection was high[,]" (3) the fact that "[h]e offended against his victims while he had [a] consenting age-appropriate sexual partner available[,]" (4) his "comorbid antisocial personality structure" resulting in him "reoffend[ing] after previous consequences[,]" (5) his "cognitive distortions[,]" (6) a "demonstrated inability to comply with treatment recommendations and supervision[,]" (7) "negative emotionality and hostility[,]" and (8) "[l]ack of motivation and poor understanding of his crimes."

---

offenses." In re Civil Commitment of R.F., 217 N.J. 152, 164 n.9 (2014) (citing Andrew Harris et al., Static-99 Coding Rules Revised-2003 5 (2003)).

[4] Scott acknowledged that "less than five percent of the people with a Static[-99R] score of [one] were observed to have reoffended." Yeoman also scored F.Z.S. as "9" on the Stable-2007, another actuarial risk assessment tool "developed to assess change in intermediate term risk status, [and] assessment needs," and to "help predict recidivism in sexual offenders." According to Yeoman, a score of nine "would be toward the upper end of the moderate range of dynamic risk."

Regarding mitigating factors, Scott acknowledged that "typically, advanced age or treatment effect can serve as mitigating circumstances." However, according to Scott, although F.Z.S. was then sixty-nine-years-old, "his age and medical conditions" did not "represent significant mitigating effect[,]" because of "his modus operandi," and the fact that he has not participated in meaningful treatment. Scott acknowledged that "after the age of [seventy], sexual recidivism [was] almost non-existent for convicted sex offenders." Nonetheless, Scott stated "[c]hild molesters . . . reportedly can recidivate even at a later age," as opposed to individuals who only display non-pedophilic rape behaviors. She attributed the phenomenon to the fact that "there is less effort required to molest a child than to overpower an adult female." Further, although antisocial personality traits can decrease with age, Scott did not "believe that [F.Z.S.]'s antisocial characteristics have diminished at all."

Yeoman also opined that F.Z.S.'s advanced age in conjunction with his extant antisocial personality traits did not adequately reduce his risk of reoffending. Yeoman explained:

> [I]t's reasonable to expect someone who did not still suffer from these personality deficits [at F.Z.S.'s age] to be able to appropriately problem solve in this circumstance . . . . [F]or example, okay, they are giving me this path, maybe I should change the way I'm doing things so I could get out of here. But, unfortunately,

8 A-0336-18T5

those personality traits are still alive in [F.Z.S.] and really skew the way he perceives things and how he believes he should do things.

Scott testified she was only able to conduct a "brief" mental status examination of F.Z.S. because he terminated the interview when she asked about his sexual offending history. According to Scott, F.Z.S. first responded "that he had not abused anyone and . . . had no victims[,]" and, when pressed, "again emphatically denied any charges against him." Scott did not attribute F.Z.S.'s denials to memory loss associated with the aging process because "apart from [admissions during] original police interviews," F.Z.S. has been consistently "denying" his sex offenses. During the aborted encounter, Scott described F.Z.S. as "irritable," "angry," and "impulsive." She explained that he "demonstrated low frustration tolerance" and "lack of victim empathy."

According to Scott, F.Z.S. met the criteria for high-end borderline intellectual functioning. He reportedly has a "[second] grade" reading and writing ability. To address his cognitive limitations, in 2014, he was placed in a cognitive life skills group, which provided "a slower [treatment] pace" but was removed for non-participation. Regarding his medical history, F.Z.S. was diagnosed with hearing loss in his left ear from an accident that occurred when he served in the military from 1968 to 1970 as an explosives expert. Scott also

9

testified that F.Z.S. "has some medical diagnoses that are not unusual for someone of his age," including "arthritis," "high blood pressure, increased lipid levels," "non-insulin dependent diabetes, genital herpes, and coronary artery disease," for which "he had a coronary artery bypass surgery in 2009."

Although F.Z.S. had no history of institutional infractions or placements in the Modified Activities Program (MAP)[5] during his thirteen years at the STU, his treatment record was reportedly inadequate. Yeoman testified that he and the treatment team recommended "[t]hat [F.Z.S.] be maintained in phase one of treatment" because F.Z.S. has "remained on treatment refusal status and that's an appropriate phase designation for people who don't participate in treatment." Yeoman opined that F.Z.S. has not received "enough treatment . . . to adequately . . . control the impulses caused by [his] disorders[,]" and "has been stagnant for . . . his time at the STU." He testified that during F.Z.S.'s interview, F.Z.S. stated that what he learned in therapy was to "'get the hell away from New Jersey,'" and that if he could leave the State "all of his problems would have been solved and will be solved."

---

[5] "MAP is a component of the clinical treatment program at the STU that focuses on stabilizing disruptive or dangerous behaviors." M.X.L. v. N.J. Dep't of Human Servs./N.J. Dep't of Corr., 379 N.J. Super. 37, 45 (App. Div. 2005).

A-0336-18T5

Scott confirmed there was "no documentation of [F.Z.S.] receiving any formal psychiatric treatment . . . during his incarceration or at the STU." Scott recounted statements attributed by past evaluators to F.Z.S. while he was incarcerated, during which F.Z.S. "endorsed . . . statements of potentially distorted beliefs about children and child molesting[,]" and disagreed with the characterization of his past sexual behavior "as deviant." Scott stated "[F.Z.S.] was admitted to the STU in 2005 as an untreated sex offender[,]" who was "generally disengaged and openly hostile in treatment." She continued "[h]e seem[ed] to perseverate on anti-systemic issues and injustices" and "refuse[d] to acknowledge or to begin to address his sexual history or sexual pathology." More recently, F.Z.S.'s April 2016 comprehensive treatment plan review "indicated that [he] continue[d] to refuse sex offender treatment, continue[d] to deny committing any sex offenses, and remain[ed] focused on the legalities of his case."

Scott explained further that although F.Z.S.'s October 2016 review showed F.Z.S. attended treatment sessions, "he did not engage in sex offender specific treatment," and "rarely contributed to the group." Instead, he "continued to focus on legal issues." Similarly, his April 2017 review showed that F.Z.S. "was again a treatment refuser[,]" and his October 2017 review

indicated that F.Z.S. "stopped attending treatment" in November 2016. The October 2017 review also noted that F.Z.S. "does not have a sexual assault cycle or a relapse prevention plan[,]" "has not attended or completed any modules or programmatic requirements[,]" and "speaks as if he is being persecuted and does not bear any responsibility for his commitment." In that regard, according to Scott, F.Z.S. remained "invested in attacking the system," rather than engaging in treatment.

Scott acknowledged that as a result of a joint effort to jumpstart F.Z.S.'s treatment, F.Z.S.'s April 2018 review indicated that F.Z.S. started attending group treatment again and participated in four "individual sessions, during which time he was agreeable and cooperative[.]" However, according to Scott, those efforts were not successful because during the sessions, F.Z.S. was not "participating and remained quiet." Likewise, Yeoman testified that after consulting with F.Z.S.'s individual treatment provider for the four individual sessions, he was advised there was "no treatment progress" as F.Z.S. "use[d] the time to convince [the therapist] of his innocence."

Regarding substance abuse treatment, despite F.Z.S.'s extensive substance abuse history, which included being "intoxicated on a daily basis" after "his son was reportedly murdered in 1968," being "intoxicated at the time of his index

12

[sexual] offense[,]" and losing "his driver's license for driving while intoxicated[,]" Scott testified F.Z.S. "ha[d] no history of substance abuse treatment in the community[,]" and "refuse[d] to participate in substance abuse treatment" at the STU as recommended back in 2006. Scott indicated this was significant because "substance abuse seemed to have contributed to his offenses." However, more recently, F.Z.S. attended a total of eight Alcoholics Anonymous self-help group meetings between February 26 and April 23, 2018.

Scott opined that F.Z.S. "remain[ed] . . . [a] high risk" to sexually reoffend "in the foreseeable future if not recommitted to the STU for further treatment." She testified that, to date, F.Z.S. had not "been able to adequately reduce his risk to sexually reoffend through treatment" given his lack of participation in meaningful treatment since his commitment in 2005. In light of that opinion, she did not believe F.Z.S. "would be highly likely to comply with conditions" of a conditional discharge plan if released because F.Z.S. "ha[d] not been compliant with a variety of recommendations" since his commitment, including "his refusal to [attend] sex offender specific groups" and "substance abuse groups[,]" as well as his frequent refusal to be meaningfully "evaluat[ed] by psychiatrists" in connection with his sex offenses. Scott testified that although F.Z.S. "belong[ed] to a group of sex offenders who could potentially [b]e

13

monitored," she "[had] no evidence or reason to believe that [F.Z.S.] would be willing to comply with conditions of a potential discharge based on his performance at the STU."

While Yeoman agreed that F.Z.S. "remain[ed] a high risk individual with regard to sex offending[,]" he acknowledged that there was "a degree of supervisability to [F.Z.S.'s] offending." According to Yeoman, F.Z.S. had saved $16,000 while housed at the STU, with which he could "afford to go to a classy boarding home where there's 24/7 supervision, and GPS monitoring," as noted by the judge. Based on victimology, Yeoman agreed that in one scenario, F.Z.S. would "have to get into a relationship with some woman who has children or grandchildren" in order to reoffend as his past child victims were not strangers. However, Yeoman explained that there was no way to be sure that such a scenario would be the only way that F.Z.S. could reoffend because "nobody at the facility knows him" to "any reasonable degree[,]" given his general refusal to engage in treatment over his thirteen years at the STU. Yeoman believed that if F.Z.S. "engage[d] in treatment, his trajectory towards discharge would be relatively short." However, Yeoman noted that "even with that clear path to discharge, [F.Z.S. was] dug in" and was "going to continue to pursue" his release on his own terms.

A-0336-18T5

In contrast, Foley opined that F.Z.S.'s risk of sexually reoffending was "below highly likely" if he were discharged with a "conditional discharge plan," which included an "[a]pproved and supervised residence, GPS monitoring," and "some sort of counseling." In rendering his opinion, Foley relied on F.Z.S.'s "history" of sex offending in "intra[-]familial" settings only, and his advanced "age." Foley also relied on the fact that "[F.Z.S.] has been easy to manage during his [thirteen] years" at the STU based on the absence of any record of "MAP placements[,]" "violence," "sex," "pornography[,]" or "drug[]" use. Foley believed F.Z.S. would comply with discharge conditions, would remain in a boarding home, and would not abscond from the State if released.

Foley rejected the State's contention that F.Z.S. would not comply with discharge conditions because of his intransigence in refusing treatment at the STU. Foley explained:

> [W]e know . . . that denial is not related to recidivism.[6] He's basically in total denial. And he has been for a long period of time. It's unrelated to recidivism. So, at that point, at his stage of life being almost [seventy], what are you really going to treat? What are you really going to do to reduce his already negligible to non-existent risk?

---

[6] Yeoman agreed "we cannot assume that denial increases risk for the average sex offender."

Foley pointed out that F.Z.S. did cooperate in four individual therapy sessions conducted in an effort to address his non-compliance in group therapy. Foley observed that given F.Z.S.'s hearing problems and cognitive limitations, "in a group it may be . . . harder for [F.Z.S.] . . . to hear[,]" "follow[]," and "comprehend[]." Foley believed F.Z.S.'s cooperation in the individual therapy sessions "demonstrated a willingness and an ability and an amenability to going to . . . treatment -- whatever is prescribed when he gets into the community."

On September 5, 2018, the judge entered an order continuing F.Z.S.'s commitment in the STU.[7] In an oral opinion, the judge agreed with the opinions of the State's experts, finding their testimony "very credible" and "very forthright." On the other hand, while the judge found the defense expert to be "a credible witness[,]" he did "not agree" with Foley's opinion. See R.F., 217 N.J. at 174 ("A trial judge is 'not required to accept all or any part of [an] expert opinion[]'" because the decision to commit "is 'a legal one, not a medical one,

_____

[7] The judge's decision was delayed awaiting the results of a deviant arousal polygraph examination arranged by F.Z.S.'s counsel. The polygraph was administered on August 28, 2018. According to F.Z.S., his negative response to the polygraph questions inquiring whether he had "masturbated to fantasies of having sex with any of [his] victims" or "any female children" within the past six months "showed no significant reaction." However, his response to the question inquiring whether he had "masturbated to fantasies of having sex with any child under the age of eighteen" within the past six months showed "a significant reaction."

even though it is guided by medical expert testimony.'" (alterations in original) (quoting In re D.C., 146 N.J. 31, 59, 61 (1996))).

According to the judge, F.Z.S. is "basically disengaged" and "hostile[,]" and has refused treatment on a "regular basis[,]" as a result of which he "has not advanced in the last [thirteen] years" at the STU. The judge found there was "clear and convincing evidence" that F.Z.S. "continue[d] to suffer a mental abnormality and personality [disorder]," that these disorders did "not spontaneously remit," and that each still "affect[ed] him emotionally, cognitively, [and] volitionally." The judge concluded there was clear and convincing evidence that F.Z.S. was "highly likely to sexually reoffend" if released. The judge also found that because F.Z.S. has "[s]erious difficulty controlling sexual violent behavior[,]" and has been non-compliant with treatment, he would not "be highly likely to adhere to conditions of conditional discharge" if released. This appeal followed.

On appeal, F.Z.S. raises the following points for our consideration:

> POINT I
>
> THE TRIAL COURT IMPROPERLY COMMITTED F.Z.S. WITHOUT CONSIDERING IF HIS PLACEMENT IN A RESIDENTIAL PROGRAM WITH [TWENTY-FOUR]-HOUR SUPERVISION AND NO ACCESS TO CHILDREN WOULD

SUFFICIENTLY REDUCE HIS RISK TO SEXUALLY REOFFEND.

POINT II

THE STATE DOCTORS ONLY OFFERED INADMISSIBLE NET OPINION WHEN THEY FOUND THAT F.Z.S. WAS AT HIGH RISK TO SEXUALLY REOFFEND (NOT RAISED BELOW).

We begin with a review of the governing principles. An order of continued commitment under the SVPA, like an initial order, must be based on "clear and convincing evidence that an individual who has been convicted of a sexually violent offense, suffers from a mental abnormality or personality disorder, and presently has serious difficulty controlling harmful sexually violent behavior such that it is highly likely the individual will re-offend" if not committed to the STU. In re Commitment of G.G.N., 372 N.J. Super. 42, 46-47 (App. Div. 2004) (citing In re Commitment of W.Z., 173 N.J. 109, 120, 132 (2002)); see also N.J.S.A. 30:4-27.32(a). N.J.S.A. 30:4-27.26 defines a "'[m]ental abnormality'" as "a mental condition that affects a person's emotional, cognitive or volitional capacity in a manner that predisposes that person to commit acts of sexual violence." The mental abnormality or personality disorder "must affect an individual's ability to control his or her sexually harmful conduct." W.Z., 173 N.J. at 127.

"'Likely to engage in acts of sexual violence' means the propensity of a person to commit acts of sexual violence is of such a degree as to pose a threat to the health and safety of others." N.J.S.A. 30:4-27.26. At the SVPA commitment hearing, "the State must prove that threat by demonstrating that the individual has serious difficulty in controlling sexually harmful behavior such that it is highly likely that he or she will not control his or her sexually violent behavior and will reoffend." W.Z., 173 N.J. at 132. Like the initial order of commitment, in order to continue to commit the individual, the court must assess the offender's "present serious difficulty with control over dangerous sexual behavior." Id. at 132-33 (emphasis in original); see also In re Civil Commitment of J.H.M., 367 N.J. Super. 599, 610-11 (App. Div. 2003).

On the other hand, "an individual should be released when a court is convinced that he or she will not have serious difficulty controlling sexually violent behavior and will be highly likely to comply with [a] plan for safe reintegration into the community." W.Z., 173 N.J. at 130. To that end, N.J.S.A. 30:4-27.32c(1) allows a court to "find a committee 'not likely' to engage in acts of sexual violence, and authorizes conditional release of such a person upon a finding that 'the person is amenable to and highly likely to comply with a plan

to facilitate the person's adjustment and reintegration into the community.'" Ibid. (emphasis in original) (citation omitted).

Our scope of review of a judgment for commitment under the SVPA "is extremely narrow." R.F., 217 N.J. at 174 (quoting D.C., 146 N.J. at 58). We must "give deference to the findings of our trial judges because they have the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Ibid. (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Moreover, "[t]he judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" Ibid. (quoting In re Civil Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)).

Accordingly, a SVPA judge's determination either to commit or release an individual is accorded substantial deference and should not be modified by an appellate court "unless the record reveals a clear mistake." Id. at 175 (citations and internal quotation marks omitted). Thus, "[s]o long as the trial court's findings are supported by 'sufficient credible evidence present in the record,' those findings should not be disturbed." Ibid. (quoting Johnson, 42 N.J. at 162); see also In re Commitment of J.M.B., 197 N.J. 563, 597 (2009).

Applying our limited standard of review, we affirm the judge's order continuing F.Z.S.'s commitment. The judge's conclusions are amply supported by the evidence presented at the review hearing, and consistent with the law governing SVPA proceedings. From our careful review of the record, we are satisfied that the judge appropriately determined that F.Z.S.'s failure to meaningfully engage in treatment to reduce the risks associated with his conditions was sabotaging the potential for his release.

F.Z.S. argues "the State failed to prove that he is now 'highly likely' to [sexually reoffend] if he were discharged with an appropriate conditional discharge plan" because the State's expert psychiatrist, Dr. Scott, refused to "assess F.Z.S.'s risk with an appropriate residential placement," that "barred his access to children" and included "GPS monitoring." According to F.Z.S., given the mitigating factors for his re-offense risk, including his advanced age, his low Static-99R score, being "fully rule-compliant at the STU[,]" and being offense free for over twenty-two years, the fact that the State's "experts expressed concern that F.Z.S. had not 'engaged' in treatment at the STU" was "irrelevant if F.Z.S. [could] be discharged with conditions that [would] render him less than 'highly likely' to sexually reoffend."

A-0336-18T5

We are cognizant of the goals of de-escalation of custody restraints, as expressed in In re Civil Commitment of V.A., 357 N.J. Super. 55, 64 (App. Div. 2003). There, we explained that "[i]n a situation where the State is unable to justify the continued confinement of the committee based on the progress the committee has made during his period of confinement," the intent of the Legislature in enacting the SVPA "is best effectuated by releasing the committee subject to intermediate levels of restraint." Ibid. (quoting In re Civil Commitment of E.D., 353 N.J. Super. 450, 456 (App. Div. 2002)). We defined the term "intermediate levels of restraint" as "envision[ing] a comprehensive treatment program in which the restraints on individual liberties associated with institutional confinement are gradually relaxed, eventually leading to outright release into the community." Ibid. However, to warrant such de-escalation, "[a]t the very least, the committee must demonstrate successful adjustment to successive reductions of restrictions within the structured environment of a secured facility as a prerequisite to consideration for a conditional release[,]" in order "to provide the trial judge with a rational and more reliable basis to assess the committee's likelihood of successful reintegration into society." Ibid.

Here, the judge was mindful, as are we, of the mitigating factors that will allow F.Z.S. to reenter society without risking the welfare of others.

22

Nonetheless, the judge credited the opinions of the State's experts, rejected F.Z.S.'s, and concluded that the State justified by clear and convincing evidence F.Z.S.'s continued confinement based on F.Z.S.'s lack of progress. Given our limited standard of review, we defer to the considered assessment of the judge that F.Z.S. is not yet ready for that next big step given the remaining obstacles to his release, and the negative risk factors otherwise identified by the State's experts. Indeed, the record supports the judge's finding that F.Z.S. has not demonstrated sufficient progress during this review period to show that he can take responsibility for his behavior in the community. That said, we are satisfied that the order for continued commitment presently before us is sustainable, anticipating that F.Z.S. may well present an even better candidate for a discharge plan when his next review session takes place. We do not, of course, preordain any result in that review, but simply observe that statutory criteria for continued commitment should not remain satisfied indefinitely.

Next, F.Z.S. argues for the first time on appeal that the State's experts offered "inadmissible net opinions because neither State doctor gave any empirical basis" nor "demonstrate[d] the soundness of their methodology" in rendering their opinion that F.Z.S. remained highly likely to sexually reoffend. F.Z.S. continues that without their testimony, "the State fail[ed] to meet its

burden of proof by clear and convincing evidence."  Ordinarily, we "decline to consider issues not presented to the trial court unless they 'go to the jurisdiction of the trial court or concern matters of great public interest[,]'" neither of which applies here.  Kvaerner Process, Inc. v. Barham-McBride Joint Venture, 368 N.J. Super. 190, 196 (App. Div. 2004) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)).

"Even so, the net opinion doctrine requires experts to 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are [scientifically] reliable.'"  Matter of Civil Commitment of A.Y., 458 N.J. Super. 147, 170 (App. Div. 2019) (alteration in original) (quoting Townsend v. Pierre, 221 N.J. 36, 55 (2015)).  Here, both of the State's experts interviewed F.Z.S. and relied on clinical information, other appropriate documents, and actuarial instruments that supported their conclusions.  They provided the factual bases for their conclusions and explained the methodologies they employed.  See In re Commitment of R.S., 173 N.J. 134, 137 (2002) (acknowledging that "a testifying expert . . . may rely on actuarial as well as clinical information when formulating an opinion concerning future dangerousness[,]" with the actuarial assessment information constituting "simply a factor to consider, weigh, or even reject").

As we stated in A.Y., where we rejected a similar challenge to the State's experts' opinions, "[t]he methodology utilized by the State's experts satisfied the requirements imposed by the Court in [In re Accutane Litigation, 234 N.J. 340 (2018),]" A.Y., 458 N.J. Super. at 173, which adopted the factors set forth in Daubert v. Merrel Dow Pharms., Inc., 509 U.S. 579 (1993), and required experts "to demonstrate" they applied "scientifically recognized methodology in the way that others in the field practice the methodology." Accutane, 234 N.J. at 399-400. Here, the experts' "testimony confirmed their opinions were based on a comprehensive review of data and information of the type relied upon by others in their scientific community[.]" A.Y., 458 N.J. Super. at 171. The fact that the experts "fail[ed] to account for some particular condition or fact which the adversary considers relevant[,]" or failed "to give weight to a factor thought important by an adverse party does not reduce [the] testimony to an inadmissible net opinion if [it] otherwise offers sufficient reasons which logically support [the] opinion." Id. at 169 (citations omitted).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0336-18T5