NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3224-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

SHANNON A. MCGUIGAN,

    Defendant-Appellant.

_____

<div style="border:1px solid">

**APPROVED FOR PUBLICATION**

**April 9, 2024**

**APPELLATE DIVISION**

</div>

Argued March 6, 2024 – Decided April 9, 2024

Before Judges Accurso, Vernoia, and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment Nos. 19-07-0888 and 20-03-0306.

Samuel Clark Carrigan, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Samuel Clark Carrigan, of counsel and on the briefs).

Nicole Handy, Assistant Prosecutor, argued the cause for respondent (La Chia Lyn Bradshaw, Burlington County Prosecutor, attorney; Nicole Handy, of counsel and on the brief).

The opinion of the court was delivered by

GUMMER, J.A.D.

After twice viewing a video recording of a police interrogation of defendant Shannon McGuigan and after the trial court barred in part the testimony of her expert witness, a jury convicted her of having committed a first-degree drug-induced death crime, in violation of N.J.S.A. 2C:35-9(a), along with other drug-related crimes. Defendant appeals from those convictions, arguing, among other things, that the interrogating detective had engaged in deceptive tactics that rendered her Miranda[1] waiver invalid and the trial court erred in admitting her statement to police and in limiting the testimony of her expert. Because the trial court did not conduct evidentiary hearings pursuant to N.J.R.E. 104, its admission of defendant's statement was plain error and its limitation of the testimony of her expert witness was an abuse of discretion. Accordingly, we remand the case and direct the trial court to conduct evidentiary hearings regarding the voluntariness of defendant's statement, the qualifications of her expert witness, and the admissibility of his opinions. As we explain in this opinion, whether defendant's convictions are affirmed or whether she is entitled to a new trial depends on the outcomes of those hearings.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

I.

After she woke up on the morning of May 30, 2017, Sheryl Maser went to her daughter Emily's bedroom and found Emily dead.[2] The county medical examiner concluded Emily had died as the result of fentanyl and heroin toxicity. That fatal overdose was not Emily's first experience with heroin.

According to data later extracted from one of Emily's cell phones, Emily had sent a text message to a contact labeled "Shannon J.R." on May 12, 2017, to purchase twenty-dollars-worth of narcotics. On May 14, 2017, Emily again texted "Shannon J.R." to arrange a purchase of thirty-dollars-worth of heroin. Defendant testified at trial that J.R. was her friend and drug dealer. She assisted him in his drug-dealing efforts by giving him rides; she received drugs in return. Defendant first met Emily about three months before her death when she drove J.R. to meet Emily so he could sell her drugs. Defendant was involved in selling heroin to Emily approximately three times. J.R. was jailed sometime in May 2017. Defendant admitted at trial she had sold and used the heroin he had left behind.

On May 19, 2017, Sheryl called 9-1-1 and reported she had found drug paraphernalia in the house she shared with Emily and that Emily was home and

_____

[2] Because of their shared last names, we use their first names when referencing Sheryl and Emily for clarity and ease of reading. We intend no disrespect in doing so.

3

had active arrest warrants. After Sheryl allowed him to enter the house, police patrolman Joshua Danka found Emily in her bedroom. Danka arrested Emily and seized approximately fifty empty wax paper folds, a glass smoking pipe, about thirty-five pills, and approximately thirty hypodermic syringes, all left out in plain view. He did not look under the bed. Detective Sergeant Brian Smith testified at trial wax paper packets are a common form of packaging for narcotics sold individually or on the street.

According to Sheryl, the police took what drug paraphernalia "they could see." After Emily's arrest, Sheryl cleaned Emily's bedroom, throwing out other wrappers and "[a]nything else [she] could find." Sheryl did not clean under Emily's bed, but she "moved the bed and cleaned around it." Following her arrest on May 19, 2017, Emily remained in jail for the next eight days.

Kyle Potts, Emily's boyfriend, picked Emily up from jail on May 27, 2017, after another friend had posted her bail. They eventually went to a party with Emily's parents at a friend's farm and then spent the night at Potts's house. Potts did not witness Emily consume any drugs at the party or that night.

According to data extracted from Emily's cell phone, Emily texted defendant the next day at 4:22 a.m.: "Hey, it's Emily. Sorry so early. Gotta sneak shit. Is J.R. still locked up? Text this number now or Fa[c]ebook Emily Maser. I need shit." Emily next texted, "But I got 40." Defendant responded,

saying J.R. was "still locked up and no one knows when he's getting out."  A few minutes later, defendant texted Emily:  "If you got a ride out here, I'll serve you, but there's no way in hell I'm driving out to [Presidential Lakes] at 6 a.m. for $40."  Emily texted her, "I need the D.," which according to Detective Smith meant "dope," a word used interchangeably with heroin.  Emily asked defendant if she would "come serve [her]?"  Throughout the day, Emily repeatedly asked defendant to meet her, and defendant eventually agreed. Emily confirmed she had $40, provided her home address, and asked defendant if she could "do eight"; defendant responded that she could do "seven."

At trial, defendant admitted she and Emily had been "texting back and forth all day" on May 28, 2017, and had agreed she would sell Emily seven bags of heroin for $40.  After taking Emily to her friend's house so she could repay the bail money, Potts dropped Emily off at her home at about 3:00 p.m. Defendant met Emily at about 6:00 p.m. at a park near Emily's home to sell her the heroin.  According to defendant, the bags of heroin she sold to Emily had a gecko stamp on them.

Potts returned to Emily's house at around 7:00 p.m.  After driving with Emily to a nearby Wawa convenience store to purchase food, Potts returned Emily to her home and left at about 2:45 a.m. on May 29, 2017.  During their time together that night, he did not see Emily take drugs.

Sometime after 6:00 p.m. on May 29, 2017, Sheryl returned home. When she arrived, Emily was home alone, in her room. Sheryl saw Emily at about 11:00 p.m., when Emily came out of her room to ask for a cigarette. That was the last time Sheryl saw Emily before finding her in her bed the next morning.

After she saw Emily's body, Sheryl called 9-1-1. Officer Danka met Sheryl outside the house. Sheryl pointed to an upstairs bedroom. Danka entered the house, went to the bedroom, and saw Emily's body. Paramedics, other patrolmen, and Detective Smith arrived on the scene. The paramedics confirmed Emily did not have a pulse.

Smith found a Motorola cell phone in Emily's hand, an Apple iPhone on her windowsill, and an LG cell phone – with Emily's name on the back – atop her dresser. Sheryl confirmed she had seen her daughter use both the Motorola and LG cell phones. Detective Smith sent the Motorola and LG to the Burlington County Prosecutor's Office High-Tech Crimes Unit for data extraction. From the results of a subpoena issued to Verizon, Detective Smith determined that one number in Emily's contact list, labelled as both "J.R. Shannon" and "Shannon J.R.," belonged to defendant.

Detective Smith found syringes on Emily's windowsill. He also found a variety of wax paper folds scattered around Emily's room. He found one used,

6

white, unstamped fold near Emily's arm; two used, white, unstamped folds underneath Emily's body; and four white, unstamped folds on a glass tray near her body. In a box underneath Emily's bed, he found several folds with a blue gecko stamp, a red Snapchat stamp, or "some sort of red mark" and several unstamped folds. Near Emily's dresser, he found one fold with a green dragon stamp in a yellow basket and one fold with a "Grand Theft" blue stamp atop her dresser.

Detective Smith did not send any of the wax paper folds found underneath Emily's bed or near her dresser for testing because they "didn't appear to contain any substance." In July 2017, he sent one of the white, unstamped folds found near Emily's body to National Medical Services (NMS), which tested it and found its contents positive for heroin, fentanyl, and quinine. Two years later, in September 2019, Detective Smith sent two more bags, also white, unstamped, and found near Emily's body; they tested positive for heroin, fentanyl, and trace amounts of quinine.

Susan Crookham, a scientist employed by NMS, analyzed results of tests NMS had performed on Emily's urine and confirmed it had contained nordiazepam, morphine, fentanyl, norfentanyl, opiates, benzodiazepines, cannabinoids, and 6-monoacetylmorphine, which is indicative of heroin use. Dr. Ian Hood, who was the county medical examiner, concluded Emily had

died from heroin and fentanyl toxicity likely within an hour from the time she was last seen alive on May 29, 2017.  Dr. Hood testified that it is "a very common scenario . . . where people have just gotten out of jail . . . lost their tolerance.  That takes one to two weeks.  And then they get out and they go and take the same old dose they were used to and they immediately die."

On November 17, 2017, approximately five and one-half months after Emily's death, Detective Smith conducted an interrogation of defendant at the police department.[3]  Smith testified he had read defendant her <u>Miranda</u> rights before she spoke with him.  In fact, he had asked defendant several questions before he advised her of her rights, including the following questions about her cell phone:

> Det. Sgt. Smith:  . . . How about a cell phone number for you?
>
> [Defendant]:  (XXX) XXX-XXXX.
>
> Det. Sgt. Smith:  What carrier is that?  Sprint?  Metro?  T –
>
> [Defendant]:  . . . Verizon.
>
> Det. Sgt. Smith:  Verizon?  How long have you had that phone number?
>
> [Defendant]:  Ever since I had a cell phone.

---

[3]  The State does not dispute the custodial nature of the interrogation.

Det. Sgt. Smith: How long is that?

[Defendant]: Years.

Once he obtained that information from her, Detective Smith advised defendant of her <u>Miranda</u> rights, and she agreed to waive them. Detective Smith told defendant he was "doing an investigation that goes all the way back 'til May" and questioned her about J.R. He initially said nothing about Emily.

Defendant denied she had "ever helped J.R. facilitate his selling in order to get . . . free [heroin]" but admitted she had occasionally provided car rides to him in exchange for drugs. When asked if she knew any of J.R.'s clients, defendant stated she "knew . . . some of them" and referenced a few by name, but not Emily. Detective Smith told defendant he did not believe she was "being completely honest" and said he "kn[e]w a lot about" her.[4] Detective Smith told defendant he had "done a pretty thorough investigation" and had "gone through a lot of records . . . [and] through cell phones and stuff like that" and suggested they "need[ed] to open up . . . an avenue of honesty."

---

[4] Before trial, defendant moved to redact this language from the recording of the interrogation to be shown to the jury, arguing it prejudicially suggested Detective Smith had additional evidence regarding defendant's drug dealing. The court granted the motion, and the detective's comments about not believing defendant was "being completely honest" and that he "kn[e]w a lot about" her were redacted and not played for the jury.

Detective Smith eventually asked defendant, "Do you know a girl named Emily?" After the detective described Emily, defendant responded, "I think I know who you're talking about." The detective asked her, "[Do y]ou remember where she lives?" Defendant named two towns and said, "I know of her," indicating she knew Emily through J.R. She admitted she previously had communicated with Emily through text messages but stated she had not been in touch with Emily in "[a] long time, because I haven't even been dealing with any of this stuff since May." She told the detective she "had started on methadone" in May and "[o]nce [she] started at the clinic, [she] wasn't dealing with anything anymore."

Detective Smith asked defendant, "[D]o you know what's up with Emily?" Defendant confirmed she had not talked to Emily since May. In response to the detective's direct question, defendant denied she had ever sold anything to Emily. Detective Smith then read to her language from some of their texts, told her that her "best bet" was to help him "figure out [her] involvement in this," and represented to her, "I'm not holding anything back. I'm not lying to you. I'm laying it all out . . . on the table and telling you what's up." Defendant then admitted she had sold heroin to Emily approximately three times and stated the last time had been before May when

she "started at the clinic," but she also admitted selling J.R.'s heroin after he went to jail for "a couple of weeks after [she] started at the methadone clinic."

Detective Smith did not tell defendant Emily had died, and throughout the interrogation, he repeatedly used the present tense when referencing her. In addition to the above questions he posed in the present tense, he asked defendant, "How old is Emily?" He asked defendant if she thought "she's in her 20s?" Before ending the interview, Detective Smith asked defendant, "Does [Emily] have a boyfriend?"

In 2019, a grand jury returned an indictment charging defendant with third-degree possession of a controlled dangerous substance with the intent to distribute, in violation of N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(3); first-degree strict liability for a drug-induced death, in violation of N.J.S.A. 2C:35-9(a); third-degree distribution of a controlled dangerous substance, in violation of N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(3); and third-degree possession of a controlled dangerous substance, in violation of N.J.S.A. 2C:35-10(a)(1).

Before trial, the State moved to bar the testimony of defendant's witness, Lawrence J. Guzzardi, M.D., who purportedly was an expert in the fields of toxicology, drug use, and addiction. In his report, Dr. Guzzardi stated, among other things, that he found "it very unusual that [Emily] could have obtained drugs of some nature from [defendant] on May 28, 2018, and not used those

11

drugs until after 11:30 p.m. on May 29, 2018," because "[t]he nature of opioid addiction is that the powerful attraction of the drug does not allow hoarding." Labelling Emily "an experienced chronic drug abuser," he also opined "[a]n experienced chronic abuser of heroin would have utilized [the amount of heroin defendant sold to Emily] quickly, likely within hours of receipt" and "[d]rugs delivered on May 28, 2018, would not have been present in [Emily's] blood if she had utilized them as expected on that date." Dr. Guzzardi addressed the effects of fentanyl on the human body; identified other potentially lethal substances for which NMS had not tested; and found "[w]ithout an examination of the internal organs, no conclusion can be made as to what other factors contributed to [Emily's] death" and "[t]he level of opioids present may or may not have been the cause of her death."

Dr. Guzzardi asserted in his report he had "worked with many, many substance abusers." His curriculum vitae (CV), however, did not provide any specific information about any recent work with "substance abusers." As set forth in his CV, Dr. Guzzardi completed a residency in emergency medicine in 1978 and the course work for a master's program in toxicology with a focus on tricyclic antidepressants in 1980. According to the information provided in the CV, Dr. Guzzardi served as a hospital's "Director" of "Substance Abuse Service" from 1988 to 1993 while he worked as an attending physician in that

12

hospital's emergency department from 1989 to 1998. Dr. Guzzardi served on specialty boards relating to family practice, emergency medicine, and medical toxicology. He held teaching positions, the last one in 1990, in emergency medicine. He gave a lecture on antidepressant overdose in April 1982, barbiturate poisoning in 1981, and "street drug" abuse in 1982.

The State conceded Dr. Guzzardi was an expert in toxicology but challenged his asserted expertise in substance abuse. The State also argued Dr. Guzzardi had issued a net opinion, with insufficient facts to support his conclusions. After hearing argument, the motion judge granted in part and denied in part the State's motion. The judge found Dr. Guzzardi's toxicology opinion "to be sufficiently supported by scientific specialized knowledge as required by the Rules of Evidence," but the doctor's "background and knowledge . . . to be insufficient to support his opinion in any aspect of drug use, abuse, addiction, and rehabilitation." The judge also found Dr. Guzzardi's opinions on Emily's inability to go days without drug use and the extent of her addiction to not be based on any facts, data, or personal interaction with Emily. Accordingly, the judge held Dr. Guzzardi could testify regarding toxicology but was prohibited from offering opinion testimony concerning drug use and addiction.

Defendant did not move to suppress the recording of the interrogation based on any putative involuntariness of defendant's waiver of her <u>Miranda</u> rights. The video recording of the interrogation was played for the jury twice: once during the presentation of the State's case in chief and once after the jury had requested to see it again during deliberations.

The jury found defendant guilty on all counts. The trial judge sentenced defendant to a twelve-year term of imprisonment, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, on the drug-induced-death conviction and concurrent to that sentence a four-year term of imprisonment on each of the other convictions, for an aggregate term of twelve years. This appeal followed.

On appeal, defendant makes these arguments:

> POINT I
>
> IT WAS PLAIN ERROR TO ADMIT DEFENDANT'S STATEMENT TO LAW ENFORCEMENT BECAUSE THE DETECTIVE DELIBERATELY HID THAT HE WAS INVESTIGATING A STRICT LIABILITY DRUG-INDUCED DEATH AND DECEIVED DEFENDANT ABOUT THE SERIOUSNESS OF THE INVESTIGATION, THUS MAKING HER <u>MIRANDA</u> WAIVER INVALID. (Not raised below.)
>
>> A. Plain error is present because the deceptive police tactics used in the instant case are the same kind that were condemned by this court in [State v.]

Diaz[, 470 N.J. Super. 495 (App. Div.), leave to appeal denied, 251 N.J. 8 (2022)].

B. Presumptively excluding a defendant's statement under these circumstances would not offend the New Jersey Supreme Court's guidance in [State v.] Sims[, 250 N.J. 189, cert. denied, __ U.S. __, 143 S. Ct. 409, 214 (2022)] because of the unique character of the strict liability drug-induced death offense.

POINT II

THE LEAD INVESTIGATOR IMPROPERLY ELICITED INCULPATORY INFORMATION FROM DEFENDANT WHEN HE ASKED ABOUT HER CELL PHONE NUMBER, PROVIDER, AND HISTORY BEFORE MIRANDA WARNINGS, REQUIRING SUPPRESSION OF THE UNMIRANDIZED STATEMENT. (Not raised below.)

POINT III

THE TRIAL COURT ERRED BY EXCLUDING THE DEFENSE EXPERT AND ADMITTING THE STATE'S EXPERT TO OFFER OPINION TESTIMONY ON THE SAME TOPICS.

Because it was plain error for the trial court to admit the recording of the interrogation without conducting a Rule 104 hearing to determine the voluntariness of defendant's statement and an abuse of discretion to limit her expert witness's testimony without conducting a hearing regarding his

qualifications and the admissibility of his opinions, we remand and direct the trial court to conduct the appropriate evidentiary hearings.

## II.

We review under the plain-error standard the admission of defendant's statement into evidence because defendant did not argue before the trial court that her <u>Miranda</u> waiver was invalid or the admission of her statement had violated her <u>Miranda</u> rights. <u>State v. Gonzalez</u>, 249 N.J. 612, 633 (2022) (quoting <u>State v. Singh</u>, 245 N.J. 1, 13 (2021)); <u>see also</u> <u>Sims</u>, 250 N.J. at 210 (reviewing the admission of the defendant's statement to police under the plain-error standard when the defendant asserted for the first time on appeal that its admission had violated his <u>Miranda</u> rights); <u>R.</u> 2:10-2. "Under that standard, an unchallenged error constitutes plain error if it was 'clearly capable of producing an unjust result.'" <u>State v. Clark</u>, 251 N.J. 266, 287 (2022) (quoting <u>R.</u> 2:10-2). "To determine whether an alleged error rises to the level of plain error, it 'must be evaluated in light of the overall strength of the State's case.'" <u>Ibid.</u> (quoting <u>State v. Sanchez-Medina</u>, 231 N.J. 452, 468 (2018)).

Our Supreme Court recently described the cornerstone importance of an individual's right against self-incrimination.

> "The privilege against self-incrimination, as set forth in the Fifth Amendment to the United States Constitution, is one of the most important protections of the criminal law." <u>State v. Presha</u>, 163 N.J. 304,

16

312 (2000) (citing U.S. Const. amend. V; State v. Hartley, 103 N.J. 252, 262 (1986)). Although New Jersey has no constitutional provision addressing the privilege against self-incrimination, our "common law has granted individuals the 'right against self-incrimination since colonial times.'" [State v.] Vincenty, 237 N.J. [122,] 132 [(2019)] (quoting [State v.] A.G.D., 178 N.J. [56,] 66 [(2003)]). Our law maintains "an unyielding commitment to ensure the proper admissibility of confessions." Ibid. (quoting State v. Reed, 133 N.J. 237, 252 (1993)).

[Sims, 250 N.J. at 211.]

The State, accordingly, bears "the burden to prove beyond a reasonable doubt that a suspect's waiver of his privilege against self-incrimination prior to an inculpatory statement 'was knowing, intelligent, and voluntary in light of all the circumstances.'" Ibid. (quoting Presha, 163 N.J. at 313). In determining whether a defendant knowingly, voluntarily, and intelligently waived the right against self-incrimination, courts consider the totality of the circumstances. Ibid.; see also State v. Nyhammer, 197 N.J. 383, 402-03 (2009) ("In determining the voluntariness of a defendant's confession, we traditionally look to the totality of the circumstances to assess whether the waiver of rights was the product of a free will or police coercion."); State v. Hahn, 473 N.J. Super. 349, 371 (App. Div. 2022) (affirming a decision to admit a defendant's statement rendered after the judge had considered the evidence presented during a Rule 104 hearing and concluded based on a totality-of-the-

17

circumstances analysis the defendant's statement was the product of free will and not police coercion), certif. denied, 252 N.J. 530 (2023).  When assessing the totality of the circumstances, a trial court "should consider" evidence of "bad-faith conduct on the part of law enforcement officers."  Sims, 250 N.J. at 216.

The trial court in this case did not engage in any such consideration.  We recognize neither party raised before the trial court the issue of the admissibility of defendant's statement or the validity of her Miranda waiver.  The State, which had a duty to prove the knowing and voluntary nature of defendant's waiver, did not move to admit the statement, and defendant did not move to exclude it.  The trial court, nevertheless, had an obligation to conduct a Rule 104 hearing to determine, based on the totality of the circumstances, whether defendant had knowingly, voluntarily, and intelligently waived her right against self-incrimination.  See State v. Miller, 76 N.J. 392, 404-05 (1978) (finding "[b]efore it can be admitted into evidence and submitted to a jury, a defendant's confession must be proven by the State to be voluntary beyond a reasonable doubt"); State v. Scott, 398 N.J. Super. 142, 153 (App. Div. 2006) (finding the "[v]oluntariness of a confession or other inculpatory statement by an accused must always be established at a N.J.R.E. 104(c) hearing before it can be introduced into evidence at trial") (quoting Biunno,

Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 6 on N.J.R.E. 104 (2006)), aff'd o.b., 193 N.J. 227 (2008).

That obligation becomes particularly clear when considering even the limited record before us. The record is devoid of any evidence defendant knew, before she waived her rights and admitted selling heroin to Emily, that Emily had died; it contains evidence Detective Smith – by initially focusing the interrogation on defendant's dealings with J.R., expressly misrepresenting facts to defendant by telling her he was "not holding anything back" and was "laying it all out . . . on the table," and repeatedly using the present tense when referencing Emily – may have attempted to conceal Emily's death from defendant and mislead her into thinking she was answering questions about and confessing to a drug deal and not a strict liability drug-induced death. In fact, at trial, Detective Smith acknowledged he had not told defendant about Emily's death and testified that, as far as he knew, defendant had thought he was talking to her about her and J.R. selling drugs.

Whether Detective Smith's actions and omissions constituted acceptable interrogation techniques that did not violate defendant's rights or bad-faith conduct designed to induce defendant to make incriminating statements she otherwise would not have made should have been examined by the trial court as part of a totality-of-the-circumstances consideration following the

19

development of a full record in a <u>Rule</u> 104 hearing.  <u>Cf.</u> <u>Sims</u>, 250 N.J. at 200, 217-18 (holding sufficient credible evidence in the record supported the trial court's finding, which was made after the court had conducted a <u>Rule</u> 104 hearing, that the totality of the circumstances warranted the denial of the defendant's motion to suppress his statement to police); <u>Diaz</u>, 470 N.J. Super. at 509 (finding, based on a record developed at a plenary suppression hearing, interrogating detectives had executed a "planned investigative strategy to elicit incriminating statements linking defendant to the overdose death before defendant became aware that someone had died").  In failing to conduct the <u>Rule</u> 104 hearing and to apply the totality-of-the-circumstances test to determine the admissibility of defendant's statement, the trial court erred.  And we conclude that error was plain error.

As the Court found in <u>State v. L.H.</u>, 239 N.J. 22, 27 (2019), "[n]o piece of evidence may have greater sway over a jury than a defendant's confession." Here, "the centrality of defendant's incriminating statements" – in which she confessed to selling heroin to a person who subsequently died of a heroin and fentanyl overdose – to the prosecution's case cannot be reasonably debated. <u>State v. O'Neill</u>, 193 N.J. 148, 184 (2007).  The trial court's failure to conduct a <u>Rule</u> 104 hearing and failure to engage in a totality-of-the-circumstances analysis concerning the admissibility of defendant's statement was "clearly

20

capable of producing an unjust result," R. 2:10-2, and, thus, constitutes plain error.

Defendant asks this court to create a rule preventing the State from using in a strict liability drug-induced death case the statement of a defendant who waived Miranda rights and admitted to selling drugs without being informed of the death of the victim or the potential strict-liability charges. We respectfully decline that request. See Sims, 250 N.J. at 211-12 ("Only in the most limited circumstances have we applied a per se rule to decide whether a defendant knowingly and voluntarily waived Miranda rights" (quoting Nyhammer, 197 N.J. at 402-03)). Given the application of the totality-of-the-circumstances test, which the Court reaffirmed in Sims, 250 N.J. at 217, we see no reason to establish a bright-line rule.

Instead, we are satisfied the remedy here is to remand the case with instructions the trial court engage in a totality-of-the-circumstances analysis after first conducting a Rule 104 hearing – the proper setting to develop the record regarding the State's ability or inability to prove the voluntariness of defendant's statement. If the trial court on remand finds the State failed to prove the voluntariness of defendant's statement beyond a reasonable doubt, defendant's convictions will be vacated and, if necessary following vacatur of the convictions, the court shall conduct a new trial at which defendant's

statement shall be excluded. <u>See</u> <u>State v. Kelly</u>, 61 N.J. 283, 294 (1972) (finding "the interests of justice will best be served by . . . having the trial judge conduct the hearing on voluntariness" of the defendant's statement and, if State failed to prove voluntariness of statement, defendant was entitled to a new trial at which the statement would be excluded); <u>State v. Stubbs</u>, 433 N.J. Super. 273, 289 (App. Div. 2013) (remanding for a <u>Rule</u> 104 hearing regarding admissibility of defendant's purported adoptive admission and ordering a new trial if the State failed to meet its burden on admissibility); <u>Scott</u>, 398 N.J. Super. at 153-54 (remanding for a "voluntariness hearing" regarding the defendant's statement and holding the defendant would receive a new trial if the court on remand found his statement was not voluntary); <u>State v. Marczak</u>, 344 N.J. Super. 388, 398-99 (App. Div. 2001) (remanding for a hearing on the voluntariness of the defendant's statements and directing, if the State failed to prove the voluntariness of the statements, conviction would be vacated and a new trial held in which the statements would be excluded).

Defendant also complains about some questions Detective Smith asked her before advising her of her rights under <u>Miranda</u>, specifically requests for her cell phone number, the name of the provider of her cell phone service, and how long she had had her cell phone and cell phone number. "[T]he term 'interrogation' under <u>Miranda</u> refers not only to express questioning, but also to

22

any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." State v. Hubbard, 222 N.J. 249, 267 (2015) (quoting R.I. v. Innis, 446 U.S. 291, 301 (1980)). Police are not required to administer Miranda warnings before asking a defendant for "routine pedigree information, including his name and address, for purposes of completing [an] arrest report." State v. Melendez, 454 N.J. Super. 445, 457 (App. Div. 2018).

To determine whether a police officer's questions, posed before the officer administered the Miranda warnings, violated a defendant's rights, "we consider whether, under the circumstances, a police officer's questioning . . . was 'particularly evocative' or 'reasonably likely to elicit an incriminating response.'" State v. Tiwana, 256 N.J. 33, 42 (2023) (quoting R.I., 446 U.S. at 303). Although questions about a person's cell phone might generally be permissible as a routine request for pedigree information, that is not what occurred here. The questions posed about defendant's cell phone were clearly for the purpose of obtaining incriminating evidence tying defendant to the drug transactions – negotiated over defendant's cell phone – that the State argued resulted in the delivery of the drugs that killed the victim. The detective violated defendant's rights by asking those questions before issuing the

<u>Miranda</u> warnings, and the trial court erred in admitting the questions and defendant's answers to them.

But because of other evidence in the record, that error was not plain error requiring, on its own, a reversal or vacation of the conviction. Without referencing the information defendant provided in response to the questions he had asked her before advising her of her <u>Miranda</u> rights, Detective Smith testified at trial he had determined by way of a subpoena issued to Verizon that the telephone number associated with the name "Shannon J.R." in Emily's Motorola cell phone – the number Emily texted when she was seeking drugs on May 12, May 14, and May 28, 2017, and from which she received responsive texts – belonged to defendant. A senior analyst from Verizon Wireless also testified at trial and confirmed defendant was the subscriber for the number involved in the text exchange.

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." <u>State v. Cotto</u>, 471 N.J. Super. 489, 531 (App. Div. 2022) (quoting <u>Townsend v. Pierre</u>, 221 N.J. 36, 52 (2015)), <u>certif. denied</u>, 252 N.J. 166 (2022). "Absent a clear abuse of discretion, an appellate court will not interfere with the exercise of that discretion." <u>Nicholas v. Hackensack Univ. Med. Ctr.</u>, 456 N.J. Super. 110, 117 (App. Div. 2018) (quoting <u>Carey v. Lovett</u>, 132 N.J. 44, 64 (1993)).

24

N.J.R.E. 702 requires a witness to qualify as an expert by "knowledge, skill, experience, training, or education." State v. Olenowski, 255 N.J. 529, 583 n. 26 (2023) (quoting N.J.R.E. 702). An expert witness must "be suitably qualified and possessed of sufficient specialized knowledge to be able to express [an expert opinion] and to explain the basis of that opinion." Cotto, 471 N.J. Super. at 530 (quoting State v. Odom, 116 N.J. 65, 71 (1989)). However, the requirements for the admission of expert testimony admissibility "are construed liberally in light of [N.J.R.E.] 702's tilt in favor of [] admissibility." Id. at 530 (quoting State v. Jenewicz, 193 N.J. 440, 454 (2008)).

"[W]hile the trial judge must determine whether the expert's training and experience are sufficient to permit the expert to state an opinion, it remains the jury's function to determine the worth of that opinion." State v. Canfield, 470 N.J. Super. 234, 327 (App. Div. 2022) (quoting Espinal v. Arias, 391 N.J. Super. 49, 58 (App. Div. 2007)), aff'd as modified, 252 N.J. 497 (2023); see also Jenewicz, 193 N.J. at 455 ("[T]he strength of an individual's qualifications may be undermined through cross-examination" and should not be used "as a reason to exclude a party's choice of expert witness to advance a claim or defense."). Lack of formal clinical training in a given area will not necessarily disqualify the expert from testifying if some other foundation for the expert's

opinion exists.  Jenewicz, 193 N.J. at 455-56.  "[A]n expert may be qualified by study without practice or practice without study[.]"  State v. Smith, 21 N.J. 326, 334 (1956); see also Koseoglu v. Wry, 431 N.J. Super. 140, 159 (App. Div. 2013).  "Deficiencies in the qualification of an expert is a matter to be weighed by the jury."  Koseoglu, 431 N.J. Super. at 161 (quoting Espinal, 391 N.J. Super. at 59).

"If a party challenges an expert opinion pursuant to N.J.R.E. 702, the 'trial court should conduct a hearing under [N.J.R.E. 104] concerning the admissibility of the proposed expert testimony.'"  State v. J.R., 227 N.J. 393, 409 (2017) (quoting State v. Torres, 183 N.J. 554, 567 (2005)).  A hearing pursuant to N.J.R.E. 104 "is a favored means to create a record for appellate review of a disputed decision."  Ibid. (quoting Torres, 183 N.J. at 554).

At trial, expert witnesses may not testify as to their net opinions. N.J.R.E. 703.  The net opinion rule "forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data."  State v. Burney, 255 N.J. 1, 23 (2023) (quoting Townsend, 221 N.J. at 53-54).  "Courts 'may not rely on expert testimony that lacks an appropriate factual foundation and fails to establish the existence of any standard about which the expert testified.'"  In re Civil Commitment of A.Y., 458 N.J. Super. 147, 169

26

(App. Div. 2019) (quoting <u>Davis v. Brickman Landscaping, Ltd.</u>, 219 N.J. 395, 410 (2014) (internal quotation marks omitted)).

The court erred in failing to conduct a <u>Rule</u> 104 hearing regarding Dr. Guzzardi's qualifications and the admissibility of his opinions and abused its discretion in barring in part his testimony. We recognize the limited support in Dr. Guzzardi's CV for an expertise in drug abuse and addiction. However, his experience as a director of a hospital's "Substance Abuse Service," albeit long ago, the lectures he gave regarding drug abuse and overdose, and his assertion he had "worked with many, many substance abusers" merited, at a minimum, further exploration in a <u>Rule</u> 104 hearing and may have been sufficient, given the liberality with which we view the requirements of N.J.R.E. 702, to permit his testimony, leaving the jury to determine its worth. The <u>Rule</u> 104 hearing also would have provided the parties an opportunity to question Dr. Guzzardi regarding the bases for his conclusory statement that Emily was "an experienced chronic drug abuser" – a description that appears to be undisputed by anyone and supported by other evidence in the record – and the opinions premised on that statement.

In sum, we remand the case for a <u>Rule</u> 104 hearing on the voluntariness of defendant's statement to Detective Smith. If the State does not prove beyond a reasonable doubt that the statement was voluntary, the convictions

must be vacated and a new trial held, at which the statement will be excluded. The questions about defendant's cell phone, cell phone carrier, and cell phone number Detective Smith asked defendant before reading her the Miranda rights and the answers she gave shall be excluded from any testimony and redacted from any recording played for a jury at a new trial. We also remand the case for a Rule 104 hearing regarding Dr. Guzzardi's qualifications and the admissibility of his opinions. If the court on remand finds Dr. Guzzardi is qualified to testify as an expert in the fields of drug use and addiction and finds that his opinions are admissible, the convictions must be vacated and a new trial held, at which Dr. Guzzardi may testify as an expert in toxicology, drug use, and addiction. If, on the other hand, the court on remand determines defendant's statement was voluntary and Dr. Guzzardi was not qualified in those fields and his opinions are inadmissible, the convictions are affirmed, subject to defendant's right to seek review of the court's remand decisions through a separate appeal of the orders issued by the trial court on remand.

Remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3224-21